# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-3266

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ALFY STIGLER,

*Defendant-Appellant.*

———————

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 03 CR 349—**Suzanne B. Conlon,** *Judge.*

———————

ARGUED JUNE 17, 2004—DECIDED JUNE 27, 2005

———————

Before FLAUM, *Chief Judge*, and MANION and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* A jury convicted Alfy Stigler of conspiring to make and possess counterfeit checks, and of possessing two counterfeit checks. He appeals his conviction arguing that there was a fatal variance between the indictment and the evidence presented at trial and that he was prejudiced by the variance. We agree, and for the reasons stated reverse his conspiracy conviction. We leave undisturbed his convictions on the two specific checks and remand for further proceedings consistent with this opinion.

### I.  Background

Alfy Stigler, Richard Young, Shaun Cross, and Allentino Hayson were charged in a four-count indictment relating to three forged and counterfeit checks that were cashed in May of 2000. Count I alleged a single conspiracy among all four defendants to cash forged and counterfeit checks, in violation of 18 U.S.C. §2 and §371. Counts II and III alleged that Stigler and Young uttered, possessed and cashed two of the checks in violation of 18 U.S.C. §2 and §513(a). Count IV alleged that Young, Cross, and Hayson uttered, possessed and cashed the remaining check. The three counterfeit checks were each stolen from a mail route in Alsip, Illinois. Those checks were: (1) a $65,082.53 check from S&G Packaging; (2) a $77,313.56 check from Ulbrich of California; and (3) a $53,332.75 check from Ulbrich of Illinois.

Young altered the check from S&G Packaging to be made payable to Stigler. Stigler deposited the $65,082.53 check into his Citibank account and later withdrew $60,000. He purchased a $20,000 cashier's check payable to Young and kept the remaining $40,000 for himself. Young deposited the $20,000 cashier's check into his own Citibank account and later withdrew $8,000 cash for his own benefit.

Citibank contacted Stigler when the counterfeit check failed to clear. Stigler had already spent $30,000 on a used Lexus, but was able to return the remaining $10,000 to the bank. Young claimed that he returned the $8,000 he withdrew to the bank as well.

Stigler passed the Ulbrich of California check to his friend, Tony Fed. Fed owned and operated Faith & Grace Trucking, and Stigler gave Fed the check, which Young altered to be made payable to Faith & Grace Trucking. Fed deposited the check into his TCF bank account and later withdrew $10,000, which he split evenly with Stigler. Fed also wrote two checks on his account: one in the amount of

$20,000 made out to Stigler, and the other in the amount of $10,839 made out to the trustee of his bankruptcy case. His later attempt to withdraw $33,000 in cash was unsuccessful as TCF Bank had already frozen his account.

As for the check from Ulbrich of Illinois, Shaun Cross approached Allentino Hayson and explained that he "knew a guy that could get some checks and put it in people names [sic]" and that the "guy" would receive 60 percent of the proceeds while the person who deposited the check would receive 40 percent, and Cross would earn "a couple of thousand" for the referral. Hayson agreed to the scheme and deposited the Ulbrich of Illinois check, which Young altered to be made payable to Hayson, into his TCF bank account, but all attempts to withdraw the proceeds failed.

Young, Stigler and Cross were tried together before a jury in June 2003.[1] Fed was charged with the offense of forgery in the Circuit Court of Cook County, Illinois for passing the Ulbrich of California check. He pled guilty to the charge, received a sentence of 24 months probation, 20 days community service, and a $2,000 fine, and then agreed to testify in the federal trial against all three in exchange for immunity from federal prosecution.

At trial, Fed testified that he knew Stigler from the Chicago Water Department, where they had worked together until 1999, when Fed left to open a trucking business, Faith & Grace Trucking. According to Fed, he was in difficult financial straits in early 2000, and was struggling to pay creditors in a personal bankruptcy he had filed in 1997. Fed testified that Stigler called him in May 2000, and offered him a way to make some money. Stigler told him that he would send him a counterfeit check. According to Fed, he would receive $15,000; $25,000 would go to Stigler,

---

[1]   A bench warrant was issued for Hayson after he failed to appear at his arraignment.

and the rest to "this Rick or Rich guy." Fed then proceed to testify in detail as to how he and Stigler cashed the Ulbrich of California check and split the proceeds. Importantly, nowhere in his testimony did Fed indicate that he had any knowledge of the S&G or Ulbrich/Illinois checks. He did not testify that he had agreed or was aware of any agreement to create or deposit counterfeit checks other than the Ulbrich of California check. He flatly denied knowing Young and Hayson.

The government's other main witness was Earnest Campbell, one of Hayson's acquaintances. Campbell testified that Cross initially approached him in May 2000, before Cross contacted Hayson, and offered him the same deal Cross offered Hayson. Campbell testified that he declined the offer, but that Hayson kept him abreast of his dealings with the counterfeit check, informing Campbell of his decision to cash the counterfeit check and subsequently showing him a copy of the deposit slip. Campbell did not offer any testimony regarding Stigler, Fed, Young or the other counterfeit checks.

Finally, Postal Inspector John Donnelly testified that he reviewed the defendants' phone records, and the records revealed a high volume of phone calls between both Stigler and Fed, and Stigler and Young, but showed only a single phone call from Stigler's residence to Cross—a phone call that Young's unrebutted testimony at trial indicated he could have made. Likewise, the records did not reflect any phone calls between Stigler and Campbell or Stigler and Hayson. Figure 1 below summarizes Inspector Donnelly's findings regarding the calls placed between the alleged co-conspirators between May 19, 2000 and June 9, 2000.



Figure 1

Finally, the district court admitted a taped conversation between Cross and Campbell at trial, in which the two talked about Hayson, referred to the Ulbrich of Illinois check, discussed drugs and women, and made insensitive remarks regarding the September 11, 2001 attacks on the World Trade Center. The district court admitted this tape against all of the alleged co-conspirators with the following limiting instruction:

> During the trial you heard about statements made by a person who the prosecutors assert is a defendant's fellow conspirator. You may consider these statements when you decide whether a particular defendant joined the conspiracy. Please remember, however, that only a defendant's own words and own acts show whether he joined the alleged conspiracy. You, therefore, should use statements by the other person to help you decide what a defendant did or said or to help you understand the defendant's acts for [sic] words.

At the close of the government's case, no direct evidence connected Stigler to the Ulbrich of Illinois check.

On June 13, 2003, the jury convicted Cross and Stigler of Count I. The jury could not reach a consensus with respect

to Young, so the district court declared a mistrial as to Young.[2] The jury also convicted Stigler and acquitted Young of Counts II and III, and convicted Cross of Count IV. Stigler moved for acquittal on Count I and for a new trial as to Counts II and III; the district court denied both motions.

At sentencing the district court judge increased Stigler's base offense level by three levels under U.S.S.G. § 3B1.1(b) for his "supervisory" role in a five-person conspiracy. This enhancement increased the applicable sentencing range from 21-27 months to 30-37 months and resulted in Stigler receiving a 30-month sentence.

## II. Analysis

On appeal, Stigler contends that there is a fatal variance between the allegations supporting Count I of the indictment and the facts established by the government at trial. Stigler also argues that the district court erred in admitting prejudicial evidence admissible solely against other defendants against him which undermined the validity of his convictions on Counts II and III. Finally, Stigler argues that the district court erred in its restitution order at sentencing. We will address each of Stigler's arguments in turn.

### A. Variance

Stigler argues that the indictment charged a single overarching conspiracy involving Stigler, Young, Fed, Cross, and Hayson but the government failed to establish a single overarching conspiracy. Stigler contends that at most the government established the existence of two conspiracies, one with Young, Fed, and Stigler, and another with Young, Cross, and Hayson.

---

[2] Young was later retried and convicted of Count I.

A variance arises when the facts proved by the government at trial differ from those alleged in the indictment. *See generally United States v. Miller*, 471 U.S. 130 (1985). "[A] conspiracy variance claim amounts to a challenge to the sufficiency of the evidence supporting the jury's finding that each defendant was a member of the same conspiracy." *United States v. Townsend*, 924 F.2d 1385, 1389 (7th Cir. 1991). Accordingly, Stigler "can succeed on his variance claim only if he can establish that the evidence at trial was insufficient to support the jury's finding of a single conspiracy and that he was prejudiced by the variance." *United States v. Payne*, 226 F.3d 792, 795 (7th Cir. 2000). We find that Stigler has met this burden.

A conspiracy exists where "(1) two or more people agreed to commit an unlawful act and (2) the defendant knowingly and intentionally joined in the agreement." *United States v. Gardner*, 238 F.3d 878, 879 (7th Cir. 2001). Coconspirators "must be mutually dependent on one another . . . or must render mutual support." *Townsend*, 924 F.2d at 1392. The government, however, need not "prove with whom a defendant conspired; it need only prove that the defendant joined the agreement alleged, not the group." *Id.* at 1389.

Here, there is insufficient evidence to establish the existence of a single overarching conspiracy. Indeed, the only evidence that links Stigler to a larger conspiracy is a single phone call placed from his residence to Cross—a phone call that Young testified that he could have made. There is no evidence of what was said in this phone call, and no evidence that Stigler made this phone call. In addition, there was no evidence presented at trial that suggests that Stigler, Cross or Hayson knew each other, or that Stigler knew that a third check even existed, and nothing in evidence suggests that Stigler stood to profit in any way from the third check.

The government argues that Fed's testimony that Stigler told him that he knew a guy who dealt in "checks" suggests

that Stigler was aware that the conspiracy involved multiple checks. But the government makes too much of the use of the plural "checks," as this reference could have been an allusion to the two checks deposited by Stigler. Moreover, even if Stigler did know that Young had dealings in counterfeit checks with Cross and Hayson, that alone would be insufficient to establish that he conspired with them. This court has made clear that it will not presume that a defendant agreed to work for the benefit of others solely because he knows they exist. *See Townsend*, 924 F.2d at 1391 (analogizing a conspiracy to a wheel with spokes and a hub and noting that "mere knowledge of the hub's activities, or those of the other spokes, is not enough to tie the conspiracy together"); *Kotteakos v. United States*, 328 U.S. 750, 755 (1946) (internal quotation and citation omitted) (noting, in a case involving an individual who processed numerous fraudulent loan applications, that "thieves who dispose of their loot to a single receiver—a single 'fence'—do not by that fact alone become confederates: they may, but it takes more than knowledge that he is a 'fence' to make them such"). Given the dearth of evidence on this issue, we cannot say that a reasonable juror would have found that a single overarching conspiracy existed.

Our finding that there was a fatal variance between the indictment and the evidence presented at trial is necessary, but not sufficient to overturn Stigler's conviction. Stigler must also have been prejudiced by the variance. *Townsend*, 924 F.2d at 1390. Nonetheless, we find that Stigler was prejudiced by the variance because he was subject to greater punishment as a result of the variance—

the district court increased Stigler's offense level by three levels from 15 to 18, pursuant to Sentencing Guideline § 3B1.1(b), for supervising a conspiracy with five or more participants. Since we find that Stigler was prejudiced by the variance, we reverse Stigler's conviction as to the

conspiracy count and we need not address the question of whether the jury's verdict on Count I was affected by the prejudicial hearsay.

Stigler also argues that validity of his convictions on Counts II and III was compromised when the district court admitted prejudicial evidence, admissible solely against Cross and Hayson, against him. We disagree and decline Stigler's invitation to reverse his convictions as to the non-conspiracy counts. The affect of the prejudicial evidence admitted against Stigler was minimal based on the district court's limiting instruction to the jury and because the evidence properly admitted against Stigler, specifically Stigler's co-conspriator Fed's testimony, was overwhelming and sufficient to convict Stigler on Counts II and III.

## B. Restitution

Finally, we turn to Stigler's argument that the district court erred by not holding the defendants jointly and severally liable and by ordering $38,000 in restitution to Citibank, where Citibank's correct actual loss was about $30,000. At oral argument, the government conceded that the district court erred in both respects, and we agree. The "total amount of restitution ordered cannot exceed the amount of the loss actually caused." *United States v. Trigg*, 119 F.3d 493, 500 (7th Cir. 1997). By ordering each defendant—Cross, Young, and Stigler—to restitution without holding the defendants jointly and severally liable, the district court ordered restitution greater than the loss. Similarly, the district court erroneously determined the amount of restitution due to Citibank. At trial, a Citibank official testified that its total loss was about $30,000, in contrast to the $38,000 ordered by the district court. This testimony is consistent with Young's testimony that he returned $8,000 to Citibank. Given the government's concession at oral argument that Citibank suffered a

$30,000 loss and the absence of any evidence to the contrary at trial, we find that the district court also erred in determining the appropriate amount of restitution.

### III.  Conclusion

For the foregoing reasons, we REVERSE Stigler's conviction as to Count I, VACATE his sentence in its entirety and REMAND for further proceedings consistent with this opinion.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*