In the

# United States Court of Appeals
## For the Seventh Circuit

---

Nos. 05-4177 & 05-4178

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

RANDY GRIFFIN and STANLEY LOMAX,

*Defendants-Appellants.*

---

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 CR 531—**David H. Coar**, *Judge.*

---

ARGUED OCTOBER 30, 2006—DECIDED JULY 16, 2007

---

Before KANNE, ROVNER, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* This case arises out of a string of armed robberies committed in 2002 and 2003. After two of the conspiracy's leaders testified at trial, a jury convicted Randy Griffin and Stanley Lomax of robbery, conspiracy to commit robbery, and using, possessing, and brandishing or discharging a firearm. Although Lomax only participated in one robbery, we find that this participation along with his travel to scout other targets and willingness to participate in additional robberies provided sufficient evidence to support his conspiracy conviction. We find no merit in the appellants' other challenges, save for Griffin's challenge to his sentence.

Because the district court attached a presumption of reasonableness to a within-Guidelines sentence in his case, and the record does not reflect that Griffin would have received the same sentence absent that presumption, the government agrees that we must remand his case for resentencing.

## I.  BACKGROUND

During 2002 and 2003, a group led by Sidney Upchurch, Travis Hoffman, and Bobby Joe Wynn committed more than a dozen armed robberies of currency exchanges and other businesses in the greater Chicago area. This was not a fly-by-night operation. Upchurch identified locations to rob and scouted out the establishments in advance, watching the employees as they came and went. In some instances, he obtained personal information about the businesses' employees, including the license plate numbers of their cars. At times, Upchurch would also pay Chicago Police Department officers (later indicted in a separate case) to obtain the addresses associated with the license plates. Upchurch's associates used that information during the subsequent robberies by telling, for example, currency exchange employees that other associates were at the employee's home with the employee's family members (though the associates were not actually there), and then naming the home's exact address.

Three robberies are relevant to this appeal. On September 11, 2003, Upchurch, Appellant Randy Griffin, Hoffman, and Wynn headed to the Richton Park Currency Exchange. When a squad car arrived in the vicinity, the group scrapped their initial plan of entering the premises as the employees closed the business. Instead, the group followed an employee home, and Wynn abducted her at gunpoint. He also obtained the employee's keys, and Griffin drove the employee's car to the currency exchange.

There, Wynn forced the employee to open the safe, and Upchurch and Griffin retrieved bags of money. Back at Upchurch's home, the four participants split the robbery's proceeds of approximately $107,101 (and also gave a portion to Hoffman's mother, who pursuant to Upchurch's plan had parked her car next to his with the thought that a single car in the parking lot would have looked suspicious). Griffin commented that the robbery had been "easy money" and told Upchurch he was available to commit more robberies; when Wynn told Griffin there might be more jobs, Griffin responded that he wanted to participate.

On September 26, 2003, Hoffman and Appellant Stanley Lomax robbed the 159th and Laramie Currency Exchange in Oak Forest, Illinois of approximately $1300, with Upchurch acting as the lookout. That morning, Upchurch, Hoffman, Wynn and a person named "Demarco" headed to the currency exchange with the intention of robbing it, but they did not do so because of heavy traffic in the area. When Upchurch attempted to gather the crew again that evening, Demarco and Wynn were not available. Upchurch telephoned Hoffman and informed him the robbery would not take place that day, but Hoffman responded that Lomax was with him and could do the job. Lomax then spoke with Upchurch over the telephone and told him he could handle the robbery. The three met that evening near the currency exchange. With Upchurch acting as the lookout, Lomax and Hoffman, armed with guns, overpowered employees Gina Garcia and Rosa Ortega, entered the currency exchange, and forced Garcia to open the safe. Garcia and Ortega heard gun shots as Lomax and Hoffman left the premises.

Sometime within the next month, Lomax rode with Upchurch, Hoffman, Wynn and Robert Jones to scout out other robbery targets. Early one morning, the group traveled to a currency exchange on Janes Street in Down-

ers Grove, Illinois, with plans of robbing it. The robbery had to be called off, however, when Jones parked the car in the wrong location. On the same trip, the group also looked at a currency exchange in Homer Glen, Illinois, before returning to Chicago. Although Hoffman and Lomax wanted to rob this currency exchange, Upchurch told them they could not.

In late October, Griffin, Upchurch, and Wynn drove to Downers Grove, Illinois with the intention of robbing the Woodridge Currency Exchange. Although the three abandoned their plan to rob the establishment that day, Griffin, Upchurch, Hoffman, Michael Bowman, and a person known as "Stacks" returned on November 4. The group robbed the currency exchange of about $3,540. They did so intending, at least in part, to obtain money to bond Wynn, then incarcerated, out of jail.

The government charged nine defendants in a twenty-six count indictment, including a charge that thirteen currency exchange robberies took place as part of a single conspiracy. Seven of the nine defendants pled guilty, with only Griffin and Lomax proceeding to trial. There, Upchurch and Wynn, law enforcement officials, and robbery victims testified for the government. A jury convicted Griffin and Lomax on all counts. Griffin was convicted of conspiring to commit robbery in violation of 18 U.S.C. § 1951; two counts of robbery in violation of 18 U.S.C. §§ 1951(a) and 2; and two counts of using, carrying, and brandishing a firearm in violation of 18 U.S.C. §§ 924(c)(1)(A) and 2. The jury found Lomax guilty of conspiring to commit robbery in violation of 18 U.S.C. § 1951; robbery in violation of 18 U.S.C. §§ 1951(a) and 2; and using, carrying, and discharging a firearm in violation of 18 U.S.C. §§ 924(c)(1)(A) and 2. On August 29, 2005, the district court sentenced Griffin to 524 months' imprisonment and three years of supervised release.

Lomax received a sentence of 308 months' imprisonment and three years of supervised release. Both appeal.

## II.  ANALYSIS

A.  Interstate Commerce

First, we address the appellants' argument that the robberies did not have an impact on interstate commerce sufficient to support their convictions under the Hobbs Act, 18 U.S.C. § 1951(a). As an initial matter, we note that although the defendants contend that accepting their argument means this court lacks "subject matter jurisdiction," the interstate commerce requirement in the Hobbs Act does not implicate our power to decide this case. *See United States v. Rogers*, 270 F.3d 1076, 1078 (7th Cir. 2001); *United States v. Martin*, 147 F.3d 529, 531-32 (7th Cir. 1998). Rather, establishing the requisite nexus with interstate commerce is an essential element of the crime. *See Martin*, 147 F.3d at 531-32. As a result, we view the evidence in the light most favorable to the government and will respect the jury's verdict so long as any rational trier of fact could have found the interstate commerce element beyond a reasonable doubt. *United States v. Re*, 401 F.3d 828, 835 (7th Cir. 2005).

The appellants were each convicted of conspiring to commit robbery and robbery in violation of 18 U.S.C. § 1951(a). As relevant here, that section of the Hobbs Act prohibits robbery that "in any way or degree obstructs, delays, or affects commerce." Griffin and Lomax maintain that the actions for which they stood trial affected purely local commerce, not interstate commerce as the statute requires. But we have repeatedly held that the government need only prove a de minimis potential impact on interstate commerce to prove a Hobbs Act violation, *see, e.g., United States v. Sutton*, 337 F.3d

792, 796 (7th Cir. 2003); *United States v. Peterson*, 236 F.3d 848, 851-52 (7th Cir. 2001), so long as "[t]he class of transactions or the types of businesses affected . . . have a substantial connection to interstate commerce, such that interference with that class of transactions would have a substantial effect on commerce—even if the specific events prosecuted do not, themselves, have a substantial effect on interstate commerce." *Sutton*, 337 F.3d at 796 n.2. The transactions of banks meet that requirement, *id.*, and we are satisfied that the transactions of the currency exchanges here do as well. And we have already rejected the appellants' argument that the Supreme Court's decisions in *United States v. Lopez*, 514 U.S. 549 (1995), and *United States v. Morrison*, 529 U.S. 598 (2000), mandate a higher standard. *Sutton*, 337 F.3d at 796; *Peterson*, 236 F.3d at 851-52.

Here, Griffin and Lomax stipulated that the robberies depleted the assets of the currency exchanges they robbed, that the exchanges conducted multiple financial transactions that resulted in the transfer of funds between Illinois and other states (including cashing checks issued by out-of-state banks and processing bills for customers resulting in payments transmitted out-of-state), and that the businesses purchased supplies from out-of-state companies. The stipulation also stated that the stolen funds would have been available for such uses and purposes if not for the robberies. We have no trouble concluding that this stipulation demonstrates at least a de minimis impact on interstate commerce. As that is all the statute requires, the appellants' challenge on this ground fails.

### B.  Conspiracy Conviction

We next address the appellants' argument that an impermissible variance existed between the conspiracy

charged in the indictment and that proved at trial. "A variance arises when the facts proved by the government at trial differ from those alleged in the indictment." *United States v. Stigler*, 413 F.3d 588, 592 (7th Cir. 2005). We treat a conspiracy variance claim as an attack on the sufficiency of the evidence supporting the jury's finding that each defendant was a member of the same conspiracy. *United States v. Nitch*, 477 F.3d 933, 936 (7th Cir. 2007) (citing *United States v. Townsend*, 924 F.2d 1385, 1389 (7th Cir. 1991)). A defendant succeeds on a variance claim only by showing that the evidence at trial was insufficient to support the jury's finding of a single conspiracy and that he was prejudiced by the variance. *Stigler*, 413 F.3d at 592. Therefore, "'even if the evidence arguably establishe[d] multiple conspiracies, there [is] no material variance from an indictment charging a single conspiracy if a reasonable trier of fact could have found beyond a reasonable doubt the existence of the single conspiracy charged in the indictment.'" *Townsend*, 924 F.2d at 1389 (quoting *United States v. Prince*, 883 F.2d 953, 959 (11th Cir. 1989)).

A conspiracy exists when: (1) two or more people agree to commit an unlawful act, and (2) the defendant knowingly and intentionally joins in the agreement. *Stigler*, 413 F.3d at 592. The government does not need to prove with whom a defendant conspired to obtain a conspiracy conviction, however, as "[t]he crime of conspiracy focuses on agreements, not groups." *Townsend*, 924 F.2d at 1389. Instead, the government "need only prove that the defendant joined the agreement alleged, not the group." *Stigler*, 413 F.3d at 592 (quoting *Townsend*, 924 F.2d at 1389).

Here, the indictment charged a conspiracy to affect commerce by robbery, with credit unions and currency exchanges the targets of the armed robberies. The government maintains that sufficient evidence supports the

jury's finding that Lomax and Griffin were part of a single conspiracy with the shared goal of committing armed robberies of currency exchanges and other commercial establishments.

Lomax's variance challenge presents the closer argument of the two. He maintains that the evidence demonstrated only that he agreed to participate in a single criminal act, namely the robbery of the currency exchange at 159th & Laramie on September 26, 2003, and, therefore, that his conviction for conspiracy cannot stand. Moreover, it is true that he did not participate in the planning of that robbery and was only a last-minute addition when other persons were unavailable. However, we disagree that the evidence was insufficient to find him guilty of the charged conspiracy. Lomax unquestionably played a central role in the 159th & Laramie robbery. But that was not all. On a different occasion within the month that followed, Lomax rode with Upchurch, Hoffman, Wynn, and Robert Jones to scout additional robbery targets. Lomax planned to rob a currency exchange in Downers Grove, Illinois with the others that day, and they did not do so only when Jones parked the car in the wrong spot. Lomax then remained in the vehicle as the group scouted another currency exchange in the town of Homer Glen. There, he made it known that he wanted to rob that location, as did Hoffman, but Upchurch said the group could not do it.

Lomax concedes that if the evidence was sufficient to show that he participated in the trip to Downers Grove and Homer Glen, the government proved his involvement in the conspiracy. The evidence relating to Lomax's involvement came from Upchurch's testimony at trial, and Lomax maintains that Upchurch's testimony should not be believed. He argues, for instance, that Wynn contradicted the testimony from Upchurch, as Wynn testified that he had never committed a crime with Lomax.

In addition, he points out that when Upchurch first named his co-conspirators to the grand jury, he did not include Lomax. But credibility is for a jury to decide, and the jury was entitled to believe Upchurch's testimony that Lomax rode with the others to scout additional targets and wanted to rob another currency exchange. *See United States v. Radziszewski*, 474 F.3d 480, 485 (7th Cir. 2007) (credibility determinations reversed only under exceptional circumstances); *United States v. Williams*, 298 F.3d 688, 692 (7th Cir. 2002) (conspirator's testimony sufficient to prove existence of a conspiracy). Lomax's counsel cross-examined Upchurch at length and questioned him regarding his initial failure to identify Lomax as a person with whom he had committed robbery. Whether to believe Upchurch was up to the jury. We conclude that his testimony was sufficient to allow the jury to find that Lomax participated in the charged conspiracy, and Lomax's fatal variance challenge fails.

Griffin's variance challenge is easier to resolve. Upchurch and Wynn each testified that Griffin was an armed participant in the robbery of the Richton Park Currency Exchange. After that robbery netted over $100,000, Griffin told Upchurch the robbery had been "easy money" and said he was available if needed again. About six weeks later, Griffin accompanied Upchurch and Wynn on a scouting trip to a currency exchange at 75th and Lemont in Downers Grove. The group did not rob the location at that time, but approximately one week later, Griffin, Upchurch, and three others returned and carried out the robbery. This evidence was sufficient to support the jury's conclusion that Griffin was a member of the charged conspiracy.[1]

---

[1] For similar reasons, Griffin's challenge to the sufficiency of the evidence to sustain his convictions for the two armed robberies

(continued...)

C.   Multiple Conspiracy Instruction

The appellants also contend that the district court should have allowed Lomax's proposed jury instruction on multiple conspiracies. *See United States v. Katalinich*, 113 F.3d 1475, 1482 (7th Cir. 1997) (multiple conspiracies exist when there are "separate agreements to effectuate distinct purposes"). After the government objected, the district court concluded that the proposed instruction was inaccurate and declined to give it.

Although we review de novo whether the substance of a jury instruction fairly and accurately states the law, *United States v. Smith*, 308 F.3d 726, 740 (7th Cir. 2002), a defendant waives the right to object to a jury instruction on appeal if the record demonstrates that the defendant approved of the proposed instruction. *United States v. Griffin*, 84 F.3d 912, 924 (7th Cir. 1996). In a conference prior to closing arguments, the district court concluded that the defense's proposed instruction was inaccurate. The district court explained its concern with the proposed instruction, and Lomax's counsel stated, "I think the way you laid it out is basically the way that we are asking for and your direction would be proper with the way you stated it and we have no objection to it." The court concluded the discussion by stating that it would draft an instruction over a break, which it did.

When the instruction conference resumed, the district court provided an instruction to the parties and requested comments from counsel. No objections to the instruction's substance were raised, although the parties briefly discussed "awkward" phrasing in the instruction.

----

[1] (...continued)
fails. Wynn and Upchurch both gave testimony detailing Griffin's participation in the robbery, and the jury was entitled to believe this testimony.

Lomax's counsel then stated, "I am not going to object to it," and "Fine, Judge. We have no objection." Counsel's affirmative statement that he had no objection to the proposed instruction constitutes waiver of the ability to raise this claim on appeal. *See United States v. Gonzalez*, 319 F.3d 291, 298 (7th Cir. 2003); *United States v. Anifowoshe*, 307 F.3d 643, 650 (7th Cir. 2002). This waiver forecloses the appellants' challenge on appeal to the denial of the proposed instruction.

### D. Findings that Firearms Were Brandished and Discharged

Griffin and Lomax also contend, as they did before trial, that a jury is the proper body to determine whether Griffin brandished a firearm and whether Lomax discharged a firearm. Under 18 U.S.C. § 924(c)(1)(A), a seven-year mandatory minimum sentence applies in certain instances when a firearm is "brandished" and a ten-year minimum when a firearm is "discharged."

At sentencing, the district court found by a preponderance of the evidence that a firearm was brandished during the robbery of the Richton Park Currency Exchange. Therefore, the district court imposed the seven-year mandatory minimum sentence for Griffin on one count, and a twenty-five year minimum sentence on another count because it was his second conviction under section 924(c). *See* 18 U.S.C. §§ 924(c)(1)(A)(ii), 924(c)(1)(C)(i); *see also United States v. Roberson*, 474 F.3d 432, 433 (7th Cir. 2007) (defendant liable for reasonably foreseeable crimes committed during course of conspiracy) (citing *Pinkerton v. United States*, 328 U.S. 640, 646-48 (1946)). The district court concluded that the ten-year minimum applied to Lomax because a firearm was discharged during the robbery of the 159th & Laramie Currency Exchange. *See* 18 U.S.C. § 924(c)(1)(A)(iii).

The appellants contend on appeal that these mandatory minimum sentences are unconstitutional because they are based on facts found only by a judge, and not admitted by the defendant or found beyond a reasonable doubt by a jury. They acknowledge, as they must, that the Supreme Court considered and rejected the argument that facts increasing mandatory minimum sentences may not be found by judges. *Harris v. United States*, 536 U.S. 545, 559-60 (2002). Although they maintain that the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), calls the *Harris* decision into question, we have held that *Harris* survives *Booker* until the Supreme Court says otherwise. *United States v. Jones*, 418 F.3d 726, 732 (7th Cir. 2005) ("[T]o the extent that *Booker* has unsettled *Harris*, it is the Supreme Court's prerogative—not ours—to say so."). Accordingly, the district court properly imposed the mandatory minimum sentences provided in section 924(c).

### E.  Lomax's Individual Challenges

#### 1.  Line-Up Identification

Lomax also raises several challenges of his own, the first concerning two currency exchange employees' identifications of him as a person who had robbed their exchange at gunpoint on September 26, 2003. Lomax contends that the identification process was unduly suggestive, and, therefore, that the district court should have granted his motion to suppress these identifications. We review a district court's decision to admit identification testimony de novo, with due deference to the district court's findings of historical fact. *United States v. Jones*, 454 F.3d 642, 648-49 (7th Cir. 2006); *United States v. Harris*, 281 F.3d 667, 669-70 (7th Cir. 2002).

"Eyewitness identification testimony violates a defendant's right to due process of law when it creates a 'very

substantial likelihood of irreparable misidentification.'" *Jones*, 454 F.3d at 648 (quoting *Neil v. Biggers*, 409 U.S. 188, 198 (1972)) (internal citation omitted). When considering whether the admission of identification testimony violated a defendant's right to due process, we have followed a two-step approach. The defendant must first establish that the lineup procedures were unduly suggestive. *Id.* at 649. If so, we consider whether the identification was nevertheless reliable. *Id.*; *cf. United States v. Brown*, 471 F.3d 802, 804-05 (7th Cir. 2006) (discussing research concerning risk of misidentification in identifications made by strangers).

The district court held a hearing on Lomax's motion to suppress. During the hearing, currency exchange employees Gina Garcia and Rosa Ortega testified, as did Detective Rick Belcher of the Oak Forest, Illinois Police Department. According to this testimony, on November 25, 2003, Detective Belcher showed a photo array to Ortega of six persons, including Lomax. Ortega did not identify anyone from the array as a participant in the robbery. Later, Detective Belcher showed the photo array to Garcia. Garcia stated that she thought the person depicted in photograph number 4 (Lomax) might be one of the persons that had robbed her employer, but she was not sure. About two months later, on January 20, 2004, Ortega and Garcia separately viewed physical lineups of Lomax and four other persons. Each asked to see subject number 3 (Lomax) a second time, and each identified that person as one of the robbers.

Turning first to whether the procedures were unduly suggestive, Lomax does not challenge the individual photo arrays or lineups, but rather the process as a whole. In particular, he argues that Ortega and Garcia only became sure that Lomax was one of the persons in the currency exchange after they had viewed a photo array *and* a physical lineup.

But viewing a physical lineup after a photo array, with both containing the defendant, is not on its own unduly suggestive. We considered a similar argument in *Harris*, where the defendant argued that the lineup identification process was unduly suggestive because he was the only person to appear in both a photo array and physical lineup (each contained multiple persons). Rejecting this argument, we stated "there is nothing per se impermissible about placing the same suspect in two different identification procedures." *Harris*, 281 F.3d at 670-71; *see also United States v. Carter*, 410 F.3d 942, 949 (7th Cir. 2005) (identification procedure not unduly suggestive when defendant appeared in two photo arrays three months apart). Noting that the physical lineup took place nearly six months after the photo array, we concluded that the amount of time that passed made it unlikely the identification had been influenced by the earlier photograph. *Harris*, 281 F.3d at 670; *cf. Stewart v. Duckworth*, 93 F.3d 262, 266 (7th Cir. 1996).

We turn to Ortega's identification first. Although the two months that passed between the procedures is shorter here than the intervening period in *Harris* or *Carter*, we still do not think it rendered Ortega's identification unduly suggestive. Two months is still a significant length of time, and Lomax points to nothing else that he contends rendered the process improper. The subjects in the photo array and physical lineup all had physical characteristics similar to his, and Lomax appeared in a different place in the photo array (where he was the fourth subject) and physical lineup (where he was third). We conclude that the district court properly denied the motion to suppress Ortega's identification of Lomax.

The testimony concerning Garcia's identification contained some discrepancies. Detective Belcher testified that he only showed her the photo array containing Lomax on

one occasion. When Garcia took the stand, over a year after Detective Belcher had visited her, she testified that she had been shown the photo array at two different times. The government maintains that the two arrays Garcia mentions in her testimony refer to one array containing Lomax and a separate array containing Hoffman, the other robber. Although this explanation is plausible, the district court did not make a factual finding as to the number of photo arrays Garcia viewed before the physical lineup. If Garcia first viewed two arrays containing Lomax, whether the procedure was unduly suggestive would be a closer question than it was in *Harris* or *Carter*.

Even if the procedure by which Garcia identified Lomax was unduly suggestive in some respect, however, her identification testimony was nonetheless properly ad-mitted because her identification was reliable. We con-sider the totality of the circumstances in making this determination, examining factors including "the opportu-nity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Manson v. Brathwaite*, 432 U.S. 98, 114 (1997) (citing *Biggers*, 409 U.S. at 199-200). Against these, we weigh the corrupting effect of the suggestive identification itself. *Id.*

Here, Garcia came face-to-face with Lomax at the front door of the currency exchange when he and Hoffman overpowered the two employees as they were leaving for the evening. She explained that she could see the robbers' faces as they struggled, and also that she, Ortega, and the two robbers all went to the back of the business together. A light remained on in the lobby, and she testified that the interior of the exchange was bright enough to see the individuals' faces. As the subject of an armed robbery after the close of business, her attention

on Lomax and Hoffman was high. Moreover, Garcia testified with certainty that the person she identified in the physical lineup four months after the robbery was one of the robbers. She also testified that when she made that identification, she did so thinking back to the robbery and not to the photo array. Especially in light of Garcia's testimony that she had a good look at Lomax's face as he entered the exchange, we find that the totality of the circumstances demonstrates that Garcia's identification was sufficiently reliable. The district court did not err in admitting either witness's identification testimony.

### 2.   Evidence of Lomax's Day-Reporting Status

Lomax also maintains that the district court abused its discretion when it allowed the government to admit evidence that he was on day-reporting status with the Cook County Department of Corrections during the conspiracy. Before trial, Lomax filed a motion asking the district court to prohibit any mention of his day-reporting status, arguing that it was not admissible under Federal Rule of Evidence 404(b). The government responded that the evidence was inextricably intertwined with the charged offense and was therefore admissible. The district court deemed the evidence admissible, a decision we review under an abuse of discretion standard. *United States v. Souffront*, 338 F.3d 809, 825 (7th Cir. 2003).

At the time of Lomax's participation in the charged crimes, he was on bond and reporting daily to the Cook County, Illinois Department of Corrections in what is known as "day reporting." The government sought to introduce evidence of Lomax's day-reporting status to explain why, although Lomax expressed interest in doing

so, Lomax did not participate in additional robberies with Upchurch and the other co-defendants.

Acts that are "inextricably intertwined" with the conduct on trial are admissible because they fall outside Rule 404(b)'s constraints on "other" crimes or acts. *United States v. Luster*, 480 F.3d 551, 556 (7th Cir. 2007). Evidence is inextricably intertwined, or "intricately related," with the charged conduct if it helps complete the story of the crime on trial, if its absence would create a conceptual or chronological void in the story of the crime on trial, or if it is so blended or connected that it incidentally involves, explains the circumstances surrounding, or tends to prove an element of the charged crime. *United States v. McLee*, 436 F.3d 751, 760 (7th Cir. 2006). Inextricably intertwined evidence is not subject to the constraints in Rule 404(b), but it still must satisfy the balancing test set forth in Rule 403 to be admissible. *United States v. James*, 464 F.3d 699, 709 (7th Cir. 2006).

Rule 403 provides that although relevant, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." In this case, testimony at trial established that Lomax participated in the robbery of one currency exchange, traveled with Upchurch and others to rob another currency exchange before the robbery was called off, and encouraged the robbery of yet another currency exchange. Upchurch said that he understood day reporting to be a community service-type arrangement where one reports in the morning to the Cook County Jail to participate in a form of "day parole." Upchurch also testified that he was not comfortable scheduling robberies around Lomax's day reporting schedule because Lomax would be taken into custody if he did not report on time, and the group would need to bond him out.

Although the government could have avoided this issue on appeal by eliciting testimony that Lomax was unavailable without reference to "day reporting" or Lomax's parole status, we do not think the district court abused its discretion when it allowed it. Upchurch's brief testimony that Lomax was on day-reporting status helped complete the story of the conspiracy for which Lomax stood trial, as it explained the circumstances surrounding Lomax's relatively brief involvement with the other conspirators. It also helped counter Lomax's argument that the short duration of his involvement demonstrated that he had not agreed to join the larger conspiracy. On this record, the district court did not abuse its discretion in admitting it.

### F.   Griffin's Sentence

Finally, Griffin argues that at his sentencing, the district court improperly applied a presumption that a sentence within the range recommended by the United States Sentencing Guidelines is reasonable. Griffin acknowledged in his sentencing memorandum that the statutory minimum sentence for his two counts of conviction under section 924(c)(1)(A) was 32 years, or 384 months. *See* 18 U.S.C. § 924(c)(1)(A)(ii), (c)(1)(C)(i). These 384 months had to run consecutively to the sentences imposed on his other counts of conviction. *See* 18 U.S.C. § 924(c)(1)(D)(ii). With respect to Griffin's non-section 924(c) convictions, the Guidelines provided for a range of 140 to 175 months. The district court calculated the resulting Guidelines range as 524 to 559 months, and Griffin asked for no more than the statutory minimum of 384 months. Griffin received a 524-month sentence.

In our appellate review of a sentence's reasonableness, we have applied a presumption that a sentence within a properly calculated Guidelines range is reasonable. *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005).

In a decision after Griffin's sentencing took place, we stated that a district court judge, in contrast, "is not required—or indeed permitted—to 'presume' that a sentence within the guidelines range is the correct sentence and if he wants to depart give a reason why it's not correct." *United States v. Demaree*, 459 F.3d 791, 794-95 (7th Cir. 2006) (citation omitted). Notably, the Supreme Court recently made clear that although appellate courts may apply a non-binding presumption that a sentence imposed within a properly calculated Guidelines range is reasonable, the presumption of reasonableness is "an *appellate* court presumption" and "applies only on appellate review." *Rita v. United States*, No. 06-5754, 2007 WL 1772146, at *9 (June 21, 2007).

At Griffin's sentencing, the district court, acting without the benefit of *Rita* or *Demaree*, stated: "[T]he burden's on the defendant to overcome the rebuttable presumption that a guideline sentence is appropriate . . . . I'm not in a position to find on this record that the presumption of reasonableness of the guideline sentence has been overcome." Accordingly, although it recognized that even the lowest end of the Guidelines range reflected a "stiff sentence," the district court sentenced Griffin to 524 months' imprisonment, at the bottom of the Guidelines range it had calculated.

In a letter submitted pursuant to our Circuit Rule 28(j) and again at oral argument, the government agreed that Griffin's sentence should be vacated as a result of the district court's application of a rebuttable presumption of reasonableness in this case. In particular, the government asserted that "the presumption of reasonableness does not directly apply at the district court level." As *Rita* makes clear, the government's position was correct, and we will vacate Griffin's sentence and remand his case for resentencing.

## III.  CONCLUSION

We AFFIRM the convictions of Griffin and Lomax, and we do not disturb the sentence Lomax received. With respect to Griffin only, we VACATE his sentence and REMAND for resentencing.

A true Copy:

       Teste:

                    _____

                    *Clerk of the United States Court of Appeals for the Seventh Circuit*