In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-2771

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DUANE L. O'MALLEY, aka BUTCH,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 2:10-cr-20042-MPM-DGB-2 — **Michael P. McCuskey**, *Judge*.

ARGUED NOVEMBER 6, 2013 — DECIDED JANUARY 8, 2014

Before WOOD, *Chief Judge*, and FLAUM and TINDER, *Circuit Judges*.

TINDER, *Circuit Judge*. Defendant-Appellant Duane "Butch" O'Malley was convicted of removing, transporting, and dumping asbestos-containing insulation. A jury was convinced beyond a reasonable doubt that O'Malley knew the insulation contained asbestos. O'Malley appeals his criminal conviction and sentence on two grounds. First, he argues that the government did not prove the appropriate

*mens rea* for the Clean Air Act violations of which he was ac-
cused: he argues that the government was required to prove
that O'Malley knew that the asbestos in the building was a
regulated type of asbestos. In the alternative, he asserts that
the district court inappropriately participated in the plea ne-
gotiations. We find that the jury was correctly instructed on,
and the government proved, the correct *mens rea* for the vio-
lations in question. We also conclude that the district court
did not improperly participate in plea negotiations. Conse-
quently, we affirm the judgment of the district court.

## I.     BACKGROUND

Because O'Malley asks us to examine both the factual cir-
cumstances of his alleged violations, as well as the conduct
by the district court, we provide a brief summary of the facts
relating to each.

### a.   The Removal of Asbestos

In 2005, Michael Pinski, a real estate developer, pur-
chased a building in Kankakee, Illinois. Prior to the purchase
he had an asbestos survey prepared, which showed that the
building contained approximately 2,200 linear feet of asbes-
tos-containing insulation material wrapped around pipes. In
2009, Pinski hired Origin Fire Protection, a company run by
O'Malley, to convert the wet sprinkler system to a dry sys-
tem.

When touring the building for this project, O'Malley
pointed out the insulation on the pipes in the building and
offered to remove the insulation for an additional payment.
Pinski, reluctant, informed O'Malley that some of the insula-
tion-wrapped pipes contained asbestos. O'Malley, however,
convinced Pinski that he would remove the insulation
properly and dispose of it in a proper landfill, and even save

Pinski money in the process. O'Malley insisted on a cash payment for the $12,000 contract price, and provided no written contract for the insulation removal work, even though he gave Pinski a written contract for the installation of the sprinkler system. O'Malley later confided in an employee that he had requested cash payments from Pinski so "there wouldn't [be] a paper trail." O'Malley and his business did not hold a license to remove asbestos, and none of the employees of the company were trained in complying with federal asbestos regulations.

Almost everyone in the cast of characters recognized the asbestos for what it was. James Mikrut, one of O'Malley's employees, walked through the building with O'Malley prior to beginning the removal, and told O'Malley that "[t]his is probably all asbestos in this building." When O'Malley offered to pay another employee, Virgil Lietz, to help remove insulation from the building, O'Malley told Lietz that the insulation may contain asbestos. Richard Folk, who was also considered for the insulation removal job, recognized the asbestos and told O'Malley that a person needed a license to remove asbestos insulation.

Ultimately, Jeff Franc was hired for the job, and Franc and three workers he recruited stripped dry asbestos insulation off the pipes using a circular saw and other equipment provided by O'Malley. O'Malley did not hire anyone with training in asbestos removal, nor did he train Franc and his workers in the proper way to remove asbestos. He did not make available to Franc's crew water or equipment for wetting the asbestos. Predictably, the circular saw produced large amounts of asbestos dust that filled the room. The workers were equipped only with a few paint suits, simple

dust masks, and useless respirators with missing filters. The workers donned the dust masks initially, but they quickly became clogged and the workers were unable to breathe through them. Franc's crew stopped working after a day or two because they inhaled a large amount of dust, and they claimed the dust made them sick. O'Malley did not notify the federal EPA or the Illinois EPA about the asbestos removal.

The discarded asbestos insulation was packed into more than 100 large, plastic garbage bags, which were then loaded into an Origin Fire Protection dump truck. O'Malley directed one of his employees, Steven Giles, to transport the bags to an asbestos-abatement company called Angel Abatement, but the company refused to accept the load of asbestos waste. Thereafter, O'Malley asked Franc to take some of the bags and dispose of them at an abandoned farmhouse a couple of miles from O'Malley's property; O'Malley also enlisted Lietz to dispose of garbage bags, which Lietz placed in a dumpster near a Hobby Lobby store. Franc was instructed to dispose of the remaining asbestos debris. Lastly, O'Malley instructed Mikrut to take the bags of asbestos in the Origin Fire Protection truck and get rid of them. Mikrut and Franc drove the truck to a field in Hopkins Park, Illinois, where they dropped the bags off at the end of a road, near a vacant house.

In September 2009, Illinois EPA director Joseph Kotas inspected both the field where the bags of asbestos had been dumped and the building from which the pipes had been removed. Kotas observed open and torn bags in the field, some of the contents spilling out onto the bare ground. EPA Superfund contractors later spent more than $47,000 to

properly remove and dispose of the bags of asbestos and to clean up the contaminated soil in Hopkins Park.

O'Malley instructed Mikrut that, if Inspector Kotas asked about the insulation that had been removed, Mikrut should deny removing the insulation and say all he did was alarm work. Mikrut indicated that he would comply with this instruction. When the federal EPA's criminal investigation division interviewed Mikrut, however, he admitted to the truth and agreed to make recorded calls to O'Malley. The calls revealed O'Malley coaching Mikrut to mislead federal agents if asked further about the asbestos removal and disposal. O'Malley also came up with the clever scheme to pin the illegal asbestos removal on Franc. When confronted by the agents, O'Malley admitted in a verbal and written statement that he had failed to stop the illegal asbestos removal even after he suspected the material was asbestos.

The material was tested and revealed to be friable asbestos containing a regulated type of asbestos at concentrations ranging from 4% to 48%.

In June 2010, O'Malley was indicted by a grand jury with five counts of knowingly violating the criminal provisions of the Clean Air Act. Pinski and Mikrut pleaded guilty, but O'Malley informed the court that he wanted a jury trial.

### b. Matters at Pretrial Conference

The district court scheduled an acceptance of responsibility deadline for O'Malley to plead guilty by August 4, 2011. On August 4, 2011, O'Malley informed the district court that he intended to proceed to trial. Before the scheduled final pretrial conference on September 7, 2011, the government filed its proposed jury instructions, which included an ele-

ment stating that the United States was required to prove general intent, specifically that "the defendant knew that asbestos-containing material was in the building." The proposed instructions also included a standard "ostrich instruction." *See*, *e.g.*, *United States v. Westerfield*, 714 F.3d 480, 485 (7th Cir. 2013). O'Malley did not object to these instructions or submit any of his own regarding knowledge. At the jury instruction conference, O'Malley's counsel affirmatively stated that he had "no objection" to the proposed knowledge instruction. Thereafter, the district court instructed the jury that, for each of the five counts, the government was required to prove that the defendant knew that asbestos-containing material was in the building.

The government submitted its initial witness list at the final pretrial conference on September 7, 2011. On September 16, the government identified an additional witness it intended to call—Virgil Lietz, an employee that O'Malley had offered to pay for the asbestos removal. Three days later, O'Malley moved to exclude the testimony of Lietz, complaining that his deadline to "accept responsibility" had already passed. At a hearing prior to jury selection, the district court stated that he would be willing to extend O'Malley's acceptance of responsibility deadline if Lietz's disclosure had caused the defendant to want to plead guilty. O'Malley declined.

### c. Trial and Sentencing

The jury returned guilty verdicts for all five counts of the indictment. O'Malley filed a motion for a new trial, but did not object to the general intent instructions or argue for a specific intent instruction. The district court denied the motion and sentenced O'Malley to 120 months of imprison-

ment, three years of supervised release, a $15,000 fine, and $47,085.70 of restitution to the EPA. The advisory sentencing guideline range was 121 to 151 months.

## II. DISCUSSION

On appeal to this court, O'Malley presents two issues for review. First, he claims that because the relevant federal law defines "asbestos-containing material" as only six types of regulated asbestos, the government was required to prove that O'Malley knew that the asbestos in the building was one of the six forms of regulated asbestos. He asserts that the government did not present evidence to demonstrate O'Malley's knowledge of the type of asbestos in the building. Second, he argues that the district court improperly participated in plea negotiations when it offered to extend the acceptance of responsibility deadline and grant the reduction for acceptance if O'Malley entered a guilty plea.

### 1. Requisite Scienter for Asbestos Crimes

Though O'Malley labels the argument about the requisite scienter of asbestos crimes as one about the insufficiency of the evidence, we agree with the government that O'Malley is actually challenging the district court's jury instructions on the *mens rea* elements of the Clean Air Act. We first briefly discuss the relevant regulatory scheme, then turn to the actual instructions given by the district court.

### a. Regulation of Asbestos

O'Malley is correct that not all forms of asbestos are subject to regulation. The Clean Air Act authorizes the regulation of hazardous air pollutants, one of which is asbestos. "Because asbestos is not typically emitted through a conveyance designed and constructed to emit or capture it, such as

a pipe or smokestack, but rather escapes from more diffuse sources such as open construction or demolition sites, EPA adopted a work-practice standard for the handling of asbestos in building demolition and renovation." *United States v. Weintraub*, 273 F.3d 139, 144 (2d Cir. 2001) (internal quotation marks and citation omitted). The EPA's regulations are the National Emission Standard for Asbestos, 40 C.F.R. §§ 61.140-157. The work practice standard promulgated for the handling of asbestos applies only to the six types of "regulated asbestos-containing material (RACM)," defined as:

> (a) Friable asbestos material, (b) Category I nonfriable ACM that has become friable, (c) Category I nonfriable ACM that will be or has been subjected to sanding, grinding, cutting, or abrading, or (d) Category II nonfriable ACM that has a high probability of becoming or has become crumbled, pulverized, or reduced to powder by the forces expected to act on the material in the course of demolition or renovation operations regulated by this subpart.

40 C.F.R. § 61.141.

"Friable asbestos material" is defined as "any material containing more than 1 percent asbestos as determined using … Polarized Light Microscopy, that, when dry, can be crumbled, pulverized, or reduced to powder by hand pressure." *Id.* Thus, there is no question that the material in question—which was both friable and contained asbestos at concentrations ranging from four percent to forty-eight percent—was indeed "regulated asbestos-containing material."

### b. Propriety of Jury Instructions

The Clean Air Act makes it a crime for any person to "knowingly violate[] any … requirement or prohibition of … section 7412 [of the Act], … including a requirement of any rule" promulgated under section 7412 of the Act. 42 U.S.C. §7413(c)(1). On all five counts, the district court instructed the jury on the knowledge elements as follows: "The government must prove … the defendant knew that asbestos-containing material was in the building." Final Jury Instructions to jury as to Duane L O'Malley, ECF No. 66, pp. 23–27. The district court also gave a definition for "regulated asbestos-containing material", stating that it "includes any material containing more than one-percent (1%) asbestos as determined using polarized light microscopy that, when dry, can be crumbled, pulverized, or reduced to powder by hand pressure." ECF No. 66, p. 30. This definition applied to a separate element of the charges: for counts 2, 3, 4, and 5—two charges of illegal asbestos removal, a charge of illegal asbestos handling, and a charge of illegal asbestos disposal, respectively—the government was required to prove that the renovation activity involved "more than 260 linear feet on pipes or 35 cubic feet of regulated asbestos-containing material." The scienter requirement was thus separate from the requirement that the government prove that the asbestos in question was of the regulated variety.

O'Malley argues that the knowledge element instruction should have required the government to prove that the defendant knew that regulated asbestos-containing material, not simply asbestos-containing material, was in the building. But this cannot be correct. As a general rule, "unless the text of the statute dictates a different result, the term 'knowingly'

merely requires proof of knowledge of the facts that constitute the offense." *Bryan v. United States*, 524 U.S. 184, 193 (1998) (footnote omitted). The Supreme Court, in *United States v. International Minerals & Chemical Corp.*, held that the phrase "knowingly violates" does not "carv[e] out an exception to the general rule that ignorance of the law is no excuse." 402 U.S. 558, 563 (1971). The *mens rea* required by the phrase is one that is higher than strict liability, such that "[a] person thinking in good faith that he was shipping distilled water when in fact he was shipping some dangerous acid would not be covered." *Id.* at 563–64. But it is certainly much lower than specific intent, especially when, as here, "dangerous or deleterious devices or products or obnoxious waste materials are involved," because "the probability of regulation is so great that anyone who is aware that he is in possession of them or dealing with them must be presumed to be aware of the regulation." *Id.* at 565. The very fact that O'Malley was knowingly working with asbestos-containing material met the *mens rea* requirement outlined in *International Minerals*, as asbestos is certainly a dangerous material of a type where "the probability of regulation is so great that anyone who is aware that he is in possession of [it] … must be presumed to be aware of the regulation." *Id.*

The application of *International Minerals* to the asbestos context is a natural one; it is not a novel construction of law. *See, e.g.*, *United States v. Ho*, 311 F.3d 589, 605–06 (5th Cir. 2002) (holding that the scienter required by the Clean Air Act in the asbestos context is mere knowledge of the presence of asbestos); *Weintraub*, 273 F.3d at 147 (holding that in the context of asbestos regulations under the Clean Air Act, "the phrase 'knowingly violates' requires knowledge of facts and attendant circumstances that comprise a violation of the

statute, not specific knowledge that one's conduct is illegal"); *United States v. Buckley*, 934 F.3d 84, 99 (6th Cir. 1991) (holding that the statutory language of the Clean Air Act requires only general intent, especially in the context of asbestos).

But it turns out we need not even undertake such a level of analysis to dismiss O'Malley's claim. O'Malley did not challenge the district court's jury instructions prior to filing his appellate brief. Indeed, his counsel affirmatively stated that he had no objection to the government's proposed jury instructions at the pretrial conference about the instructions. "Counsel's affirmative statement that he had no objection to the proposed instruction constitutes waiver of the ability to raise this claim on appeal." *United States v. Kirklin*, 727 F.3d 711, 716 (7th Cir. 2013) (quoting *United States v. Griffin*, 493 F.3d 856, 864 (7th Cir. 2007)) (internal quotation marks omitted); *see also United States v. Natale*, 719 F.3d 719, 729 (7th Cir. 2013) ("Although passive silence with regard to a jury instruction permits plain error review, … a defendant's affirmative approval of a proposed instruction results in waiver.") (citations omitted). Because O'Malley failed to object to the jury instructions in question in the district court, we need not even reach the plain error review to which the district court's instructions would otherwise be subject: review that would nonetheless lead to the conclusion that the district court's instructions on scienter were proper.

### 2. Propriety of the District Court's Conduct at the Witness Exclusion Hearing

O'Malley's second argument is that the district court participated in plea negotiations, violating Rule 11 of the Federal Rules of Criminal Procedure. O'Malley's counsel conced-

ed at oral argument that O'Malley did not object on this ground in the district court. He did not seek a writ of mandamus, seek to have the judge recused or removed, or seek any other remedy in response to the judge's alleged unfairness. Because this issue was not preserved before the district court, we apply a plain error standard in reviewing the claim. *See United States v. Vonn*, 535 U.S. 55, 58 (2002) ("A defendant who failed to object to trial error may nonetheless obtain reversal of a conviction by carrying the converse burden, showing among other things that plain error did affect his substantial rights."); *see also United States v. Covington*, 681 F.3d 908, 910 (7th Cir. 2012) (holding that an argument raised for the first time on appeal is reviewed only for plain error). We find that there has been a plain error if we determine "(1) that the district court erred; (2) that the error was plain; and (3) that the error affected [O'Malley's] substantial rights." *Covington,* 681 F.3d at 910 (citing *United States v. Luepke*, 495 F.3d 443, 448 (7th Cir. 2007)).

The context of the exchange that O'Malley characterizes as judicial impropriety is as follows. On September 21, 2011, prior to jury selection, the district court considered O'Malley's objection to the government's disclosure on September 16 that it would be calling Virgil Lietz. The deadline for disclosing witnesses was unclear: the district court did not set a deadline requiring parties to file witness lists, and the government filed its initial witness list on September 7, 2011, prior to the scheduled final pretrial conference date. But the government supplemented its list on September 16, after it learned of Lietz's last name in witness preparation. It appears Lietz had been a person of interest during the government's investigation—when known only by his first name—and that knowledge of his last name led to finally

finding and interviewing him. As soon as the government decided to call Lietz, the government notified defense counsel and supplemented the witness list. O'Malley promptly moved to exclude Lietz's testimony, asserting in a written motion that one reason for excluding Lietz was that "[t]he deadline for the Defendant to 'accept responsibility' in this case has passed." Def.'s Mot. to Exclude Test., *United States v. O'Malley*, No. 10-CR-20042 (C.D. Ill. Sep. 19, 2011), ECF No. 63.

On September 21, the district court heard argument from both sides about the inclusion of Lietz. The judge asked O'Malley's counsel why O'Malley would be prejudiced by Lietz's inclusion, when the name was not a surprise to O'Malley. Counsel responded that O'Malley's decision to go to a jury trial or not was made "with the witness list and exhibit list that the government had tendered by the deadline and not the current witness list." The district court expressed some skepticism at this remark, noting that the acceptance of responsibility date had in fact passed before the government had filed its witness list and expressing that O'Malley's decision to change his plea could not have been based on the witness list. In expressing his incredulity, the district judge stated,

> So, really, Mr. O'Malley's decision as to whether he wanted to change his plea came before the filing of the witness list and the final pretrial; but if somehow this is the witness that's the tipping point, the witness that if it had—if we knew he was going to testify, we would have accepted responsibility long ago and we never thought he was going to testify,

I'd extend the acceptance of responsibility right
now. I'd take an open plea right now, if that's
what the defendant wishes to do, and give him
acceptance instead of, in effect, sanctioning the
government by striking the witness.

Tr. of Oral Arg. on Mot. to Exclude Gov't Witness at 10–11,
*United States v. O'Malley*, No. 10-CR-20042 (C.D. Ill. Sep. 21,
2011), ECF No. 84.

Reading the statement in context, it is clear to us that it
was O'Malley, not the district court, who first raised the is-
sue of the acceptance of responsibility deadline: in the writ-
ten motion submitted to the court, then again at the hearing.
The court was merely responding to the alleged prejudice—
O'Malley's ability to choose whether to go to trial—and at-
tempting to cure it. We can see how the phrasing of the
judge's statement can appear ambiguous; the statement
could be interpreted as an offer to extend the deadline.
However, on careful reading, it appears the judge was using
the subjunctive. He indicated that in the improbable case
that O'Malley believed his chances at trial were doomed by
the introduction of Lietz, the judge would extend the dead-
line for acceptance of responsibility to ensure O'Malley had
the opportunity to enter a plea instead of moving forward
with trial. He was, with this hypothetical, calling O'Malley's
bluff. While we would not present the district court's state-
ment as a model of clarity, we believe it is clear that the
judge had no animus against the defendant or an improper
motive in stating that were O'Malley's concerns real, the
judge would be willing to address them. The statement was
far from an actual, impermissible intervention in plea nego-
tiations.

We conclude that the district court's conduct at the witness exclusion hearing passes plain error review because there is no evidence that the district judge's statement affected O'Malley's substantial rights.

### III.    CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgment.