NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued April 24, 2012
Decided May 2, 2012

*Before*

WILLIAM J. BAUER, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 11-3409

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee,* | Appeal from the United States District Court for the Southern District of Illinois. |
| *v.* | No. 3:11-cr-30089-DRH-1 |
| DWON L. LOTT, *Defendant-Appellant.* | David R. Herndon, *Chief Judge.* |

## O R D E R

Dwon Lott pleaded guilty to possessing a firearm as a convicted felon, 18 U.S.C. § 922(g)(1). The district court sentenced him to 46 months' imprisonment, the bottom of his Guidelines range. He argues on appeal that the district judge did not adequately consider his "extraordinary" family circumstances, which in his view warranted a sentence of home confinement. But the record shows that the sentencing judge did consider and reject the argument. Accordingly, we affirm the judgment.

Police officers were investigating a loud radio in East St. Louis, Illinois, when they saw Lott, then 36 years old, run into a public-housing apartment leased by his then-girlfriend, Gloria Clanton. The officers went to the door and obtained Clanton's consent to search the

apartment. They found a loaded pistol, a small amount of ecstasy, and two grams of crack cocaine in a dresser drawer in the master bedroom. Lott was arrested and released by state authorities, giving him time to marry Clanton in April 2011. But in May 2011, Lott was charged in federal court with violating § 922(g)(1) and arrested; he was detained without bond and has been in custody ever since. During the plea colloquy he stipulated to a 2005 felony conviction in Hawaii for "terroristic threatening in the first degree," HAW. REV. STAT. §§ 707–716. He also admitted that he got Clanton to buy the pistol for him using her name because he was prohibited from possessing a gun, and that he had been selling drugs "trying to make a dollar."

A probation officer detailed Lott's criminal history and calculated his Guidelines imprisonment range in a presentence investigation report. Lott's conviction in Hawaii (and actually there was a second conviction for "abuse of family and household member" arising from the same incident) was for pushing his then-wife down to the ground, standing over her, and threatening her with a steak knife. He was sentenced to 90 days in jail followed by probation, but in 2006 authorities in Hawaii issued a (still pending) arrest warrant and moved for revocation of Lott's probation after he absconded. He turned up in Illinois, where he committed several crimes, including unlawful use of a weapon in 2008. This criminal history placed Lott in Category III, which, combined with his total offense level of 21, yielded a Guidelines imprisonment range of 46 to 57 months.

Lott filed a sentencing memorandum but did not object to the Guidelines calculations; he instead requested home confinement on the ground that Clanton and her son, Kelvin, needed him at home. See U.S.S.G. § 5H1.6. Lott did not assert that Clanton and Kelvin (then eight years old) depended on him financially; in fact, Clanton supported the family working as a bus operator. Defense counsel insisted, though, that Lott "played a tremendous role in the step-child's life and was the only available source for positive male bonding" because Kelvin's father had never been part of his life. Counsel also asserted that Clanton and Kelvin had experienced difficulty adjusting to Lott's incarceration and that Clanton was recovering from and requires further surgery. Counsel attached to his memorandum 11 letters of support from family and acquaintances, including Clanton, her mother and two adult children, Kelvin, and one of Kelvin's teachers. Clanton described Lott as a "role model" for Kelvin and "a great husband and a great father" who would cook dinner and get Kelvin and her granddaughter to school and back. Lott also had helped her during a recent surgery, Clanton said, and she was delaying another surgery because with Lott in jail she did not have anyone to help around the house or with Kelvin. Kelvin's teacher wrote that she recruited Lott to be a classroom volunteer, which he did with energy and enthusiasm. He would give the boys in class pep talks "on doing the right thing," run errands on party days, and read to students as part of the school's "Real Men Read" program. She added that Lott's incarceration had "affected Kelvin's work in a negative way." Kelvin told the court that Lott spent time with him doing things like going to ball games, playing video games, and helping with schoolwork.

At the sentencing hearing, the parties addressed Lott's argument that his family circumstances warranted a sentence below the Guidelines range. Defense counsel repeated Lott's request for home confinement, but Lott did not testify, and counsel presented no evidence beyond the letters attached to Lott's sentencing memorandum (and another from a neighbor submitted just before the sentencing hearing). The government retorted that Lott's conduct showed that he was not setting a good example for his family. In imposing the sentence, the judge reasoned:

> So there are a lot of things to think about here in terms of mitigating circumstances. There's no question that the letters that I got, particularly the letter from the teacher, give me pause in terms of what I should do in this case. The letter from Kelvin, the step-son, certainly give[s] a sentencing judge pause in consideration of what I should do. There certainly seems to be—on paper there's a suggestion of a change in Mr. Lott's direction in terms of how he's approaching life in the interim from the day of the incident to the day of his arrest. Question becomes: Is it someone who's gotten the message or is it someone who knows something's coming down and making every effort to put the best light on things knowing that one day he's going to be sitting exactly where he's sitting now?

> And it's not at all unusual for me to see this completely different picture when I read letters from family members and the close friends from what I read in a criminal history. That's quite typical. For example, the letter that I read just before I came out had a line in it, something to the effect of, *I've never known*—let me just look at the letter and read it exactly. *I have never known him to be in any trouble.* Well, completely contrary to his criminal history. So that's just not unusual at all.

> And as [defense counsel] says, there's no question that Mr. Lott cares very much about his family and has great family support. So when you're sitting in my position, you're sitting in my seat, a sentencing judge, at least I do—I can't speak for all sentencing judges. I have a couple of reactions: One reaction is, I think that's a very strong mitigating factor and it provokes a feeling of wanting to do something to help the family. But the offsetting feeling is, you almost feel anger. It's like you have this family and you have these people that care for you, how can you possibly do this? How can you break the law? How can you use the woman you love and ask her to break the law to get you a gun? How can you carry a gun and deal drugs when you have people like this depending upon you? How can you risk the fact, risk the opportunity or the chance of going to prison when you have people like this depending on you? See, that's the

counter-balance to the mitigating part. People like . . . Kelvin, who sounds like just a great young man, depend[] on you, Mr. Lott, but yet you've engaged in extraordinarily risky behavior like having his mother buy you a gun that could put her in prison.

Now, the government, right now—the government at that time wasn't charging women and other people for straw purchases, and I understand now they have an initiative of charging those people. They could still go back and charge her. And they're charging other people for that very conduct. So you know, your conduct flies in the face of their love and their support. And so on the one hand, when you're in my position you feel warm and fuzzy about people that want to give you support and love, and on the other hand you think, how can a guy do that to his family? So it's—it carries both a mitigating element and an aggravating element, and people take it to the sentencing judge because they want the judge to go easy on them, but you have to make that approach with a great deal of care because when you do that, there's the other side of that coin, and so I think the aggravating side is a tough one in your case.

The judge then analyzed the sentencing factors, *see* 18 U.S.C. § 3553(a), most importantly concluding that Lott had continued violating the law despite past lenient sentences, demonstrating that he has no respect for the law and has not been adequately deterred from committing more crimes. The judge addressed Lott and explained that the judge's own "view of what is proper correctional treatment, quite frankly, just differs from how you and [defense counsel] have analyzed this case." The court remained unconvinced that Lott wasn't "deserving of more time" given his history but relented and imposed a low-end sentence of 46 months.

On appeal Lott, now characterizing his family circumstances as "extraordinary," argues that the district court failed to "adequately" consider his argument that his absence would have a "severe negative impact upon his immediate family." Lott contends that the district judge should have addressed specific "uncontested facts," including, he now maintains, that he was the "primary caregiver and sole resource for positive male bonding" for Kelvin, that his wife had difficulty finding childcare after his incarceration, that his wife needs surgery that she is postponing in his absence, and that Kelvin is now struggling in school without Lott's guidance. Instead, according to Lott, the judge "brushed aside" his argument on the erroneous assumption that Lott's "criminal acts caused his separation from his family."

A review of the sentencing transcript shows that the judge did consider Lott's family circumstances argument, and his reason for rejecting it is clear. A judge need not be explicit where "anyone acquainted with the facts would have known without being told why the judge

had not accepted the argument." *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005); *see also Gary*, 613 F.3d at 709 (same); *United States v. Pulley*, 601 F.3d 660, 667 (7th Cir. 2010) (noting that short explanation suffices where reasoning underlying judge's conclusion is clear from context); *United States v. Poetz*, 582 F.3d 835, 836 (7th Cir. 2009) (concluding that sentencing judge fulfilled obligation because "the totality of the record demonstrate[d] that the judge implicitly considered and rejected" argument). Here, right after Lott's lawyer made the argument, the judge acknowledged that the letters "gave him pause" because Lott's "family support" carries a "mitigating element." The judge identified, however, a stronger "counter-balance" to this element, chiding Lott for engaging in such risky conduct—particularly asking his wife to risk jail for buying him the gun—when Lott's family depended on him. Essentially the judge told Lott that his family circumstances looked more like an aggravating factor. *See United States v. Jackson*, 547 F.3d 786, 794–95 (7th Cir. 2008) (rejecting contention that district court had failed to consider argument that defendant's youth was mitigating factor, since court did consider youth of defendant but decided that "unfortunately . . . it happens to cut against him in this case"); *see also United States v. Vazquez-Pita*, 411 F. App'x 887, 892 (7th Cir. 2011) (nonprecedential disposition) (explaining that, in realm of discretionary sentencing, every defendant who proposes argument in mitigation runs the inherent risk that contention "may sound to the court more like a factor in aggravation").

So we are satisfied that the district court considered and rejected Lott's argument regarding his family circumstances. This conclusion refutes Lott's heavy reliance on *United States v. Schroeder*, 536 F.3d 746 (7th Cir. 2009), which we have said stands for the proposition that a district court may not summarily disregard a defendant's potentially meritorious argument regarding his family circumstances. *Gary*, 613 F.3d at 711; *see also United States v. Diekemper*, 604 F.3d 345, 355 (noting *Schroeder* inapplicable where judge considers family circumstances argument).

AFFIRMED.