In the

# United States Court of Appeals
## For the Seventh Circuit

No. 15-2596

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

CHRISTOPHER EBERTS,

*Defendant-Appellant*.

Appeal from the United States District Court for the
Central District of Illinois.
No. 13-10070-001 — **Joe Billy McDade**, *Judge*.

ARGUED JUNE 8, 2016 — DECIDED JULY 22, 2016

Before BAUER, MANION, and KANNE, *Circuit Judges*.

PER CURIAM. Christopher Eberts, a Canadian citizen and U.S. permanent resident, is a film producer whose notable credits include *Lord of War* (2005) and *Lucky Number Slevin* (2006). But after producing a string of failed movies, in 2009 he filed for bankruptcy. He also convinced a novice author from Illinois to wire him over $600,000 so that Eberts could adapt his book into a movie. Eberts instead used that money to buy lavish personal items, and his actions led to criminal

charges. He pleaded guilty to seven counts of wire fraud, *see* 18 U.S.C. § 1343, and three counts of money laundering, *see id.* § 1957, and he was sentenced to 46 months' imprisonment. He argues that the district court failed to consider the 18 U.S.C. § 3553(a) sentencing factors or Eberts's mitigation arguments and instead based the sentence on unsupported facts. We disagree and affirm the judgment.

## I. BACKGROUND

Around the time that Eberts filed for bankruptcy in California, he was introduced by a mutual acquaintance to Illinois resident Jeff Elliott. Elliott was interested in adapting into a movie a book he had written several years earlier about his son's recovery from a brain tumor. Eberts and Elliott formed a limited liability company in April 2009. Both men agreed to invest money toward producing the movie, but Eberts did not disclose his insolvency. Over the next year Elliott wired about $615,000 to accounts controlled by Eberts. Eberts applied only 10% of that money toward the movie; he paid his father and bankruptcy attorney thousands of dollars and spent the rest on personal items like art, furniture, designer clothing, custom shoes, luxury watches, cosmetic medicine, and fine wines. Eberts also solicited and received a $25,000 loan from Elliott for an unrelated project and never repaid it.

After Elliott discovered the scam in December 2010, he severed ties with Eberts and sued him for fraud in federal court.[1] Eberts did not appear for the bench trial in that civil

---

[1] Elliott later found other producers for the movie, which was released in January 2015. *See Hoovey*, IMDB, http://www.imdb.com/title/tt2828884/ (last visited July 20, 2016).

suit, and the district court ordered him to pay Elliott over $1 million in compensatory and punitive damages. *See Elliott v. Eberts*, No. 11-1163 (C.D. Ill. May 22, 2012). Almost three years later Eberts (via his mother) paid Elliott $400,000, and Elliott agreed to forgo the remaining balance.

In the meantime Eberts was charged with seven counts of wire fraud (for seven wire transfers from Elliott to Eberts), *see* 18 U.S.C. § 1343, and three counts of money laundering (for Eberts's wire transfers to an art gallery, his father, and his bankruptcy attorney), *see id.* § 1957. The district court released him on bond but revoked the bond after Eberts tested positive for cocaine and opiate use, failed to disclose an October 2014 state forgery conviction, and solicited $250,000 from an undercover FBI agent by pitching an unrealistic business investment. A couple of weeks after Eberts had paid Elliott in the civil suit, he pleaded guilty without a plea agreement to all ten counts of wire fraud and money laundering.

A probation officer calculated a guidelines range of 37 to 46 months' imprisonment. The total loss amount of $578,500 resulted in Eberts's base offense level being increased by 14, *see* U.S.S.G. § 2B1.1(b)(1)(H), and his total offense level thus was 21 with a criminal-history category of I. Eberts initially objected to the loss calculation and the denial of an adjustment for acceptance of responsibility. But at the sentencing hearing, he withdrew those objections and instead argued that he deserved a below-guidelines sentence because he had demonstrated an "extraordinary acceptance of responsibility" based on his willingness to plead guilty, the $400,000 he had paid Elliott in the civil suit, and the likelihood of his removal to Canada after serving his sentence.

Elliott and Eberts both testified at the sentencing hearing. Elliott described how Eberts repeatedly lied to him, stole from him, and put his family through a great deal of pain while Eberts was off "having a good time partying in Greece, Spain, [and] St. Barts." For his part, Eberts apologized to Elliott and his family and declared that he had "been overwhelmed by feelings of remorse, guilt, sadness, [and] fear." He insisted that his "intentions going into the project to begin with were all good" but that he had gotten "sidetracked to a certain point for a variety of reasons."

The district judge sentenced Eberts to 46 months' imprisonment—the top of the guidelines range—and 3 years' supervised release, and ordered him to pay $178,500 in restitution. The judge suspected that Eberts "saw an opportunity to capitalize on someone's vulnerability to make some money" when he approached Elliott about making the movie. Eberts had been living a "fast" and "glamorous" Hollywood lifestyle, the judge said, and had used his "power of persuasion to sell a con job to" Elliott even though Eberts "never had any intentions of making that movie." The judge acknowledged that he "could be wrong about that" but emphasized that Eberts had spent only about $61,000 on producing the movie while spending hundreds of thousands of dollars on "luxury items" for himself. The judge also noted that Eberts's actions while released on bond—including fraudulently soliciting money from an undercover FBI agent—showed that he was "not trustworthy." There existed a "substantial likelihood" that Eberts would commit additional crimes because, the judge continued, "I don't think there is anything else you know how to do." The judge also rejected Eberts's request for a lower sentence based on acceptance of responsibility, explaining that the $400,000 payment was not "voluntary"—it merely was a

settlement and a "good business deal" in a civil case where Eberts owed over $1 million. Finally, the judge expressed his desire to communicate to Eberts and others thinking of committing similar crimes that they cannot "take advantage of vulnerable people like that."

## II. ANALYSIS

On appeal Eberts challenges his within-guidelines sentence. He first argues that the district court procedurally erred because it did not "specifically address" the § 3553(a) factors and instead forced the parties to "ascribe some connection implicitly." But a district judge need not explicitly mention each (or any) of the § 3553(a) factors, so long as the judge's reasoning is consistent with the applicable sentencing factors. *See United States v. Leiva*, 821 F.3d 808, 822 (7th Cir. 2016); *United States v. Washington*, 739 F.3d 1080, 1081–82 (7th Cir. 2014). The district judge's reasoning easily satisfies that standard: the judge considered the nature and circumstances of the offense (highlighting that Eberts took advantage of Elliott by selling him a "con job" to maintain his "glamorous" and "fast" lifestyle), Eberts's history and characteristics (stressing that he continued his fraudulent behavior while out on bond), the need to protect the community (finding a "substantial likelihood" that Eberts would reoffend), and the need to promote respect for the law and provide just punishment (noting that the sentence should convey to Eberts and anyone thinking of committing similar crimes that they "can't take advantage of vulnerable people like that").

Eberts next argues that the district court failed to consider his arguments in mitigation. First, he faults the court for not

acknowledging that he faces removal to Canada upon his release from prison. But the judge was not required to specifically address Eberts's undeveloped contention that he had pleaded guilty in spite of his likely removal; while a district court may consider a defendant's immigration status, it need not explicitly discuss a stock argument like the painful consequences of removal. *See United States v. Mendoza*, 576 F.3d 711, 721–22 (7th Cir. 2009). Second, Eberts faults the court for failing to recognize that the $400,000 he paid Elliott in restitution before pleading guilty represented an "extraordinary acceptance of responsibility." But, as explained by the district court, Eberts's payment was not even voluntary, let alone extraordinary—he waited to settle the civil suit with Elliott until just days before he pleaded guilty, three years after he had been ordered to pay over $1 million. *See United States v. Grasser*, 312 F.3d 336, 340 (7th Cir. 2002) (concluding that defendant who, on day of sentencing, pledged 42% of amount owed to plaintiff in civil suit did nothing extraordinary). And the judge did take this payment into consideration by ordering Eberts to pay restitution of only $178,500, the sum left over after $400,000 was subtracted from the total loss amount.

Finally, Eberts argues that the district court based its sentence on "unsupported information." In his view, the court incorrectly found, for instance, that he had approached Elliott about making the movie and that he never intended to make the movie. But Elliott told the court that Eberts and their mutual acquaintance had raised the movie idea with him, and the court was entitled to credit that characterization. *See United States v. Harris*, 791 F.3d 772, 779 (7th Cir. 2015). Moreover, Eberts pleaded guilty to wire fraud, which requires a specific intent to defraud, *see United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016), and he acknowledged that he

had "misrepresented [his] actions" to Elliott and spent only 10% of Elliott's money on the movie. There was ample evidence to support the sentence imposed by the district court.

AFFIRMED.