In the

# United States Court of Appeals
## For the Seventh Circuit

No. 15-3625

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MICHAEL ANGLIN,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 14-cr-3 — **C.N. Clevert, Jr.**, *Judge.*

ARGUED NOVEMBER 7, 2016 — DECIDED JANUARY 25, 2017

Before EASTERBROOK and WILLIAMS, *Circuit Judges*, and
FEINERMAN, *District Judge.**

FEINERMAN, *District Judge.* A jury found Michael Anglin
guilty of Hobbs Act robbery, discharging a firearm in fur-
therance of a crime of violence (the Hobbs Act robbery) un-
der 18 U.S.C. § 924(c), and related offenses. The district court

---

* Of the Northern District of Illinois, sitting by designation.

sentenced him to 230 months' imprisonment, followed by three years of supervised release.

Anglin appeals, pressing three challenges. First, he contends that the police arrested him without probable cause in violation of the Fourth Amendment, requiring suppression of the arrest's fruits. Second, he contends that his § 924(c) conviction was improper because Hobbs Act robbery is not a qualifying crime of violence. Third, he contends that his sentence is improper in various respects. Except for his challenge to the supervised release conditions, Anglin's arguments are without merit, so we affirm in large part and vacate and remand only as to that component of his sentence.

## I. Background

On December 9, 2013, three men robbed an automobile repair shop in Milwaukee: our defendant, Michael Anglin ("Anglin"); his brother, Dave Anglin ("Dave"); and Michael Green, an associate of theirs who at all relevant times lived at the same federal halfway house as Dave. During the robbery, Anglin shot a repair shop employee in the abdomen.

The next day, Green turned informant. He called the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), identified himself, and reported that the Anglin brothers were plotting to commit robberies and wanted him to join them. ATF registered Green as a "confidential informant" and assigned Special Agent Rick Hankins to lead its investigation.

Hankins met with Green three days later, on December 13. Green reported that he had befriended Dave at the halfway house and become a trusted confidant of both Anglins. Green said that the Anglins recently invited him to commit

robberies with them. According to Green, Dave needed cash and was impatient to commit "any kind of robbery." Green said that he had ridden in Anglin's SUV several times, once accompanying the brothers to Anglin's residence. Green also said that on December 7 or 8, the Anglins showed him two assault rifles and a pistol inside the SUV.

For informing on the Anglins, Green sought early termination of his supervised release and/or moving expenses for his family, but he received no promises of either. Green did not tell Hankins about the December 9 robbery that he and the Anglins committed. Hankins asked Green to tell the Anglins that he knew somebody who could help identify a target, so that ATF could insinuate an undercover agent into the group.

During this initial conversation, Green provided cell phone numbers for both Anglins, a description of Anglin's car ("a silver or grey crossover SUV"), the general whereabouts of Anglin's residence ("on the edge of town"), the race and nickname of Dave's girlfriend ("a black female named 'Star'"), and a description of her car (a white Escalade). He also referred to the Anglins as "convicted felons."

Hankins and his colleagues corroborated most of those details. They discovered that the Anglins' mother was the registered owner of a silver Acura MDX SUV and lived just inside Milwaukee's western border. While monitoring Dave's comings and goings at the halfway house, they saw him enter a white Escalade registered to Starmiqua Broom. They verified that Dave was serving a federal prison sentence for bank robbery and that Anglin had a state felony conviction for gun possession.

Hankins and Green met again on December 16. Green reported that the Anglins, wary of outsiders, preferred not to add a fourth participant and intended to select a robbery target themselves. They also intended to act quickly; their plan was to rob "something" within the next several days. Green also revised one aspect of his December 13 statement: the Anglins showed him two guns, not three, in the SUV on December 7 or 8—an assault rifle and a pistol.

Hankins showed Green a photo of the apartment complex where the Anglins' mother lived and a generic image of a silver Acura MDX from the same model year as hers. Green confirmed that the former depicted the residence he visited with the Anglins and that the latter matched the appearance of Anglin's SUV. Before departing, Hankins gave Green a digital recorder to surreptitiously capture future conversations with the Anglins.

At 5:00 a.m. the next morning, Hankins noticed a text message from Green: "They trying to do something in the morning what I do." Hankins immediately called Green. Green reported that the Anglins had planned an armed robbery, to be carried out by the trio sometime after 8:00 a.m., which was the earliest that Dave and Green could leave the halfway house. Hankins told Green to go along with the plan and keep ATF apprised of the Anglins' movements.

Hankins and another agent went to the mother's residence. Shortly after 8:00 a.m., they saw Anglin leave the residence and drive off in the Acura, which was parked outside. A short while later, Green called Hankins to report that Dave left the halfway house just after 8:00. According to Green, the plan was for Anglin to pick up Green at or near the halfway house, and then meet Dave "out on the street." Green re-

layed further information about the planned robbery: the target was a drug house somewhere near 74th Street and Capitol Drive, about three miles from the halfway house. Green did not know the exact address.

Green further reported that Dave told him to look out for a black Dodge Charger parked near the halfway house that looked like a "fed." Green later called Dave and told him that the Charger appeared to be watching a different house down the street. To be safe, the Anglins and Green changed Green's pickup location from the halfway house itself to the corner of Center Street and Fond du Lac Avenue, a few blocks away. This, too, Green told the agents.

At some point, the team tailing Anglin lost track of him in the Acura. Hankins, meanwhile, joined federal agents and Milwaukee police officers in unmarked cars near the new rendezvous point. At 8:40 a.m., Hankins observed Green standing on the north side of Center near Fond du Lac. Hankins contacted Green and instructed him to turn on his recorder.

At 8:48 a.m., the Acura approached Green from the east and pulled up to the curb, with Anglin behind the wheel. Green got into the passenger seat. The Acura then turned right on Fond du Lac, heading northwest in the general direction of 74th and Capitol. Hankins and the rest of the surveillance team followed the Acura at an inconspicuous distance for several minutes, but found it difficult to stay close in rush hour traffic. Concerned about the threat to public safety that an armed robbery might pose if the Acura eluded them, Hankins asked city police to pull over the vehicle. A marked Milwaukee Police Department squad car was summoned, pulled behind the Acura, and activated its lights and

sirens. Anglin did not stop; instead, he made a U-turn and headed back southeast on Fond du Lac. The Acura stopped only once a second police vehicle blocked its path. Anglin and Green were taken into custody.

At approximately 10:15 a.m., police located Dave at Broom's house and arrested him. The Acura was impounded and searched pursuant to a warrant, yielding a nine-millimeter pistol under the passenger seat. Agents also searched the Anglins' mother's residence, finding a box of ammunition among Anglin's personal effects. Over the course of several debriefing interviews, Green admitted to having committed other robberies while at the halfway house, including the December 9 repair shop robbery, in which he implicated the Anglins.

Anglin was initially charged only with being a felon in possession of a firearm. He moved to suppress the evidence obtained as a result of his arrest (presumably the gun found in the Acura, though he did not specify), arguing that the officers who pulled over the Acura lacked probable cause to arrest him. The magistrate judge recommended suppression, and then reaffirmed that recommendation after the district judge requested further consideration in light of *Navarette v. California*, 134 S. Ct. 1683 (2014). The district judge rejected the magistrate judge's recommendation, holding that there was probable cause to arrest Anglin based on Green's tip, and denied his motion.

A grand jury returned a five-count superseding indictment against Anglin, charging him with: (1) Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a); (2) discharging a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii); (3) conspiracy to commit Hobbs Act rob-

bery; (4) being a felon in possession of a firearm; and (5) being a felon in possession of ammunition. A jury found Anglin guilty on all counts in April 2015. His post-trial motions were denied—including, as relevant here, a renewed motion to suppress and a motion to dismiss the § 924(c) charge in light of *Johnson v. United States*, 135 S. Ct. 2551 (2015), which was decided after the verdict.

At sentencing, Anglin faced a 120-month mandatory minimum term on the § 924(c) count, to be followed by consecutive sentence for the other counts, which carried an advisory guidelines range of 110 to 137 months' imprisonment. The government asked for a sentence at the high end of the guidelines range (257 months in total), pointing to Anglin's criminal record, his lack of remorse, and lasting harms to the person he shot.

Defense counsel sought a sentence well below the guidelines range. Noting that during plea negotiations the two sides memorialized an agreement that seven to ten years would be an appropriate total sentence, he argued that the government's 257-month recommendation penalized him for going to trial. The district judge interjected, telling counsel he "can rest assured that there will be no additional punishment imposed in this case just because your client went to trial," and stating that he does not "take into account any negotiations between the government and the defendant that do not result in a recommendation that is jointly urged upon the Court." Defense counsel next argued that, because Anglin would be 35 years old by the time the ten-year minimum term expired, the court should sentence him far below the guidelines range on the remaining counts. He explained:

> The 924(c) here means that you're not punish-
> ing a 25-year-old man who doesn't get it.
> You're punishing a 35-year-old man. And
> you're punishing that 35-year-old man each
> additional year. And you're saying we have no
> hope for you at 36 you're gonna make it; at 37
> you're gonna do a better job; 38 I don't know if
> I can trust you. …

> And when this court considers what's suffi-
> cient but not greater than necessary, what's ap-
> propriate under all the circumstances, I'm look-
> ing at a 35-year old man. I'm looking at some-
> one who has just done 10 years in prison, who
> has hopefully gotten all of the benefits of it.

The court imposed a 230-month sentence—the 120-month mandatory minimum for the § 924(c) count, plus a consecutive term of 110 months, the low end of the guidelines range for the remaining offenses. In justifying the sentence, the court cited the "long-lasting" effect on the shooting victim and the need to deter others "looking to make a quick buck," while also emphasizing the need not to "overly punish." In particular, the court said that it would "take into account that there is a mandatory minimum sentence" as "was underscored in the arguments of" defense counsel, and that it "will not and should not penalize a defendant for going to trial." The judge added that defense counsel's arguments "reminded [him] of a recent book written by Professor Michelle Alexander which is called 'The New Jim Crow.' And so this court does not approach sentencing blindly or without due regard for the consequences of substantial in-

carceration, particularly in a case like this with a young man age 25."

The presentence report recommended a supervised release term and proposed numerous supervised release conditions. Neither side addressed supervised release in its briefs or otherwise objected to the proposed conditions. At the sentencing hearing, the government asked for four to five years of supervised release. Defense counsel did not discuss supervised release in his arguments.

The court imposed a three-year term of supervised release, explaining as follows:

> [THE COURT:] With regard to supervision, the Court is imposing the mandatory terms of supervision as discussed in the presentence report for the reasons discussed in the presentence report.
>
> The Court is likewise imposing conditions over and above those—the additional conditions of supervision as discussed in the presentence report except as follows:
>
> With regard to paragraph 3 in part B of the presentence report, the defendant shall follow the instructions of his probation officer and answer truthfully all inquiries by the probation officer subject to his right under the Fifth Amendment against self-incrimination.
>
> The Court does believe that supervision in this case is warranted particularly in light of the defendant's criminal history and failure to suc-

cessfully complete state supervision prior to committing the crime in this case.

Is there any reason to articulate these grounds for supervision any further?

[DEFENSE COUNSEL]: No, Your Honor.

[THE GOVERNMENT]: No, Your Honor.

The court closed the hearing by asking, "Is there anything else or any argument that you believe the Court has not taken into account fully, [defense counsel]?" Defense counsel answered, "I can't think of any right now, Your Honor."

## II. Discussion

### A. Probable Cause to Arrest

We first consider whether there was probable cause to arrest Anglin. Our review is *de novo*. See *United States v. Shields*, 789 F.3d 733, 743 (7th Cir. 2015).

Probable cause determinations are exercises in holistic, commonsense decisionmaking. See *Illinois v. Gates*, 462 U.S. 213, 230–32 (1983). "Police officers have probable cause to arrest when the totality of the facts and circumstances within their knowledge at the time of the arrest would warrant a reasonable person in believing the person has committed a crime." *Hart v. Mannina*, 798 F.3d 578, 587 (7th Cir. 2015). "Probable cause is a fluid concept that relies on the commonsense judgment of the officers based on the totality of the circumstances." *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006). Additionally, "[p]robable cause only requires that a probability or substantial chance of criminal activity exists; it does not require the existence of criminal activity to be

more likely true than not true." *Mucha v. Vill. of Oak Brook*, 650 F.3d 1053, 1056–57 (7th Cir. 2011).

In determining whether the officers had probable cause to arrest Anglin, we do not write on a blank slate: this court already found probable cause to arrest Dave on essentially the same facts when his appeal—Dave and Anglin were prosecuted separately—was before us. See *United States v. Dave Anglin*, 626 F. App'x 181, 185 (7th Cir. 2015). In Dave's case, too, the challenged seizure was predicated primarily on Green's tip, which we found sufficient. "[A]lthough the officers were unable to corroborate allegations of criminal activity until after the stop," we explained, "they *were* able to corroborate numerous innocuous details, including the vehicle driven by [Dave] Anglin's girlfriend, the residence of [Michael Anglin], and [Dave] Anglin's criminal history." *Id*. at 184. We further noted that Green "disclosed details that only someone close to [the Anglins] would know," such as their phone numbers, and that "the officers corroborated information about Anglin's *future* actions—including the brothers' locations on the morning of the planned robbery." *Id*. at 184–85. Finally, we noted that Green "made himself accountable if the tip turned out to be false" by giving his identity and agreeing to record his conversations with the Anglins. *Ibid*. These facts, we held, gave the officers reasonable suspicion to briefly detain Dave and pat him down; significantly, we added that "the same information that supported the officers' reasonable suspicion"—*i.e.*, Green's statements—"also gave them probable cause to arrest." *Ibid*.

Although our order in Dave's case is not precedential, see Cir. R. 32.1(b), our holding was correct, and we see no reason to reach a different conclusion here. Anglin argues that

probable cause was absent because Green was untested and untrustworthy. But the facts known to the agents at the time of Anglin's arrest established Green's credibility well enough for his tips to supply probable cause, even though they could not yet know with certainty whether he was telling the truth.

For starters, the agents had confirmed most of the details Green provided: the fact that both Anglins had felony records, the identity of Dave's girlfriend, the make and model of her car, the location of Anglin's residence, and the description of Anglin's car. Green would not have known these things if he did not have some genuine familiarity with the Anglins. See *United States v. Jones*, 208 F.3d 603, 606, 609 (7th Cir. 2000) (holding that corroboration of an informant's statements regarding the suspect's residence, vehicle, and criminal history helped establish probable cause based on the informant's tip); *United States v. Lloyd*, 71 F.3d 1256, 1259, 1263 (7th Cir. 1995) (similar). In particular, Green's accurate (if somewhat imprecise) descriptions of Anglin's car and the location of his residence were consistent with his claim to have spent time with the Anglin brothers away from the halfway house. Cf. *United States v. Peck*, 317 F.3d 754, 756 (7th Cir. 2003) (holding that the officers lacked probable cause where, "even though [the informant] stated that she was Peck's girlfriend, she was unable to give any information regarding Peck other than that he was a black male"). Moreover, the agents observed Anglin following the itinerary that Green relayed, to the point of watching him pick Green up and drive off with him. After that, there could be no doubt that Green knew the Anglins personally, was familiar enough with their affairs to accurately predict their behavior, and—crucially—was in fact personally involved with what-

ever they were up to that morning. See *Gates*, 462 U.S. at 245–46 (holding that specific predictions of the defendants' future movements, later proven accurate, bolstered an anonymous tip's credibility because they established the tipster's bona fides as a confidant of the defendants); *United States v. Huebner*, 356 F.3d 807, 814 (7th Cir. 2004) ("Consistent with the informant's predictions, on the day of the controlled buy, agents observed Huebner leaving his residence and stopping at another location very close to his home. Insofar as Huebner's actions mirrored [the informant's] prediction of this event, it became clear that [the informant] indeed possessed 'inside information,' further establishing his reliability.").

The agents had another reason to regard Green as generally credible. Green was under federal sentence and therefore faced serious consequences if caught lying to federal investigators. The agents knew his name and where he lived: a halfway house where he was obliged to spend every night. If Green lied, he would be easy to find. See *Navarette*, 134 S. Ct. at 1689 (holding that using 911 to make a report is an "indicator of veracity" because it has "features that allow for identifying and tracing callers").

Finally, Green's key assertions, if fabricated, could and likely would have been exposed as falsehoods. Green told agents the approximate time and location of an imminent armed robbery, enabled them to tail the Acura in order to observe the crime unfolding, and said that he was recording his conversations in the SUV. If this were an elaborate ruse, that would have become apparent soon enough. Under the circumstances, it was reasonable for the agents to conclude that Green was being honest with them.

Anglin argues that Green's account of the planned robbery was vague, shifting, and therefore dubious, but Green's imprecision was consistent with the rest of what he told the agents. The Anglins led the operation and were parsimonious with details, so it was no surprise that Green could not give a specific address for the planned robbery or a detailed account of how it would transpire. See *United States v. Booker*, 612 F.3d 596, 601 (7th Cir. 2010) (holding that an informant's inability "to predict many aspects of" a planned drug transaction did not defeat probable cause). That is especially true where, as here, Green promptly relayed additional details about the plan as he learned them.

Anglin identifies two specific inconsistencies that he believes should have given the agents pause. First, on December 13, Green said the Anglins showed him three guns, but on December 16, he revised that to two guns. That minor discrepancy hardly compelled the conclusion that Green was untrustworthy. If anything, the agents could reasonably have seen it as a sign of good faith that he went out of his way to set the record straight on an unverifiable detail.

Second, Anglin asserts that Green did not accurately predict how the morning in question would unfold. This argument relies on the inaccurate premise that Green told the agents that he and Anglin would pick up Dave from his girlfriend's house, which was in the opposite direction from the robbery's location. But Hankins was clear on this point: even though Dave was headed to his girlfriend's house when he left the halfway house, Green told agents that the plan was for Dave to meet Anglin and Green somewhere "out on the street," not at her house. Doc. 34–4 at 620. Driving in the

general direction of the robbery target was consistent with that plan.

Although unnecessary, it bears mention that the agents had one final data point by the time of the arrest, and it derived not from Green's say-so, but from direct observation of Anglin. A traffic stop of Anglin's vehicle required only reasonable suspicion. See *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014); *Navarette*, 134 S. Ct. at 1687. Anglin concedes that Green's tips sufficed for that purpose. Doc. 18 at 17, 24. But by the time the officers *arrested* Anglin, which required probable cause, they had seen him respond to the attempted traffic stop by making a U-turn and traveling some distance in the opposite direction, not stopping until a second police vehicle blocked his path. That evasive conduct was an additional factor supporting probable cause. See *Shields*, 789 F.3d at 746 ("[T]he officers had at least reasonable suspicion at the time of their initial encounter with Mr. Shields and acquired additional bases for probable cause when Mr. Shields fled and removed the firearm from his pocket.").

Given the totality of the circumstances, the officers had ample probable cause to arrest Anglin. It follows that the district court properly denied his motion to suppress.

## B. Conviction Under § 924(c)

Anglin next challenges his § 924(c)(1)(A)(iii) conviction for possessing and discharging a firearm during a crime of violence, contending that Hobbs Act robbery is not a "crime of violence" within the meaning of the statute.

Section 924(c)(1)(A)(iii) prohibits discharging a firearm "during and in relation to any crime of violence." Section 924(c)(3) defines "crime of violence" to include any felony

that either "(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another" (the elements clause, also known as the force clause), or "(B) by its nature, involves a substantial risk that physical force against the person or property of another may be used" (the residual clause). Anglin was convicted of Hobbs Act robbery, 18 U.S.C. § 1951(a), for the December 9 repair shop robbery, during which he discharged his gun. The question, then, is whether a Hobbs Act robbery conviction can serve as a predicate "crime of violence" under either prong of § 924(c)(3).

Anglin argues that the § 924(c)(3)(B) residual clause is invalid under *Johnson*, 135 S. Ct. 2551. In this, he is right. See *United States v. Cardena*, 842 F.3d 959, 996 (7th Cir. 2016) ("[W]e hold that the residual clause in 18 U.S.C. § 924(c)(3)(B) is … unconstitutionally vague."). That leaves the question whether Hobbs Act robbery falls within the § 924(c)(3)(A) elements clause. We recently found it unnecessary to decide that issue, see *Davila v. United States*, 843 F.3d 729, 731 (7th Cir. 2016), but here we must confront it.

The Hobbs Act defines robbery, in relevant part, as the taking of personal property "by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property." 18 U.S.C. § 1951(b)(1). Committing such an act necessarily requires using or threatening force. Pressing the opposite view, Anglin asserts that a robber hypothetically could put his victim in "fear of injury" without using or threatening force. This argument is contrary to our precedents.

In *United States v. Armour*, 840 F.3d 904 (7th Cir. 2016), we considered whether the § 924(c)(3)(A) elements clause en-

compassed federal attempted armed bank robbery as de-
fined by 18 U.S.C. § 2113(a), (d)—which can be accomplished
"by intimidation" or by "assault," with "assault" defined as
"an intentional attempt to inflict or threat to inflict, bodily
injury … that creates in the victim a reasonable fear or ap-
prehension of bodily harm" and that "may be committed
without actually touching, striking, or injuring the other per-
son." *Id.* at 908–09. We answered yes, reasoning that a "vic-
tim's fear of bodily harm is necessarily fear of violent physi-
cal force." *Id*. at 909.

We also held in *Armour* that Indiana robbery, which simi-
larly can be accomplished by "putting any person in fear,"
satisfied the identical "use, attempted use, or threatened use
of physical force" requirement in § 4B1.2(a)(1) of the Sen-
tencing Guidelines. 840 F.3d at 907. In so holding, we reject-
ed the argument that Anglin makes here, that "'putting any
person in fear' does not necessarily involve 'the use, at-
tempted use, or threatened use of physical force against the
person of another.'" *Ibid*. And we rejected similar arguments
in *United States v. Duncan*, 833 F.3d 751, 758 (7th Cir. 2016)
("In the ordinary case, robbery by placing a person in fear of
bodily injury under Indiana law involves an explicit or im-
plicit threat of physical force and therefore qualifies as a vio-
lent felony under § 924(e)(2)(B)(i)."), and in *United States v.
Lewis*, 405 F.3d 511, 514 (7th Cir. 2005) (equating "the use, at-
tempted use, or threatened use of physical force" with "put-
ting any person in fear" of physical injury).

For these reasons, Hobbs Act robbery is a "crime of vio-
lence" within the meaning of § 923(c)(3)(A). In so holding,
we join the unbroken consensus of other circuits to have re-
solved this question. See *United States v. Hill*, 832 F.3d 135,

140–44 (2d Cir. 2016); *In re St. Fleur*, 824 F.3d 1337, 1340 (11th Cir. 2016); *United States v. Howard*, 650 F. App'x 466, 468 (9th Cir. 2016); cf. *United States v. Robinson*, 844 F.3d 137, 141–44 (3d Cir. 2016) (holding that Hobbs Act robbery may constitute a § 924(c) "crime of violence" where, as here, the two crimes are contemporaneous, but not deciding whether Hobbs Act robbery categorically fits the elements clause); *id*. at 150–51 (Fuentes, J., concurring) (concluding that Hobbs Act robbery categorically fits the elements clause). And because Hobbs Act robbery is a crime of violence under § 924(c)(3)'s elements clause, it was a valid predicate for Anglin's § 924(c)(1)(A)(iii) conviction.

### C. Sentencing

Anglin argues that the district court committed a variety of sentencing errors.

#### 1. Custodial Sentence

First, Anglin asserts that the district court erred by failing to address his argument that the government's recommended 257-month sentence unfairly punished him for going to trial. That is wrong, as the court did address the argument.

At the hearing, Anglin's counsel reiterated at some length the argument from his sentencing brief that the government's recommendation sought to impose a "trial penalty." The court responded, cutting in after several minutes: "[T]his court does not enhance a defendant's sentence merely because he or she has asked for a trial. I never have and I never will. So you can rest assured that there will be no additional punishment imposed in this case just because your client went to trial." That promise acknowledged—indeed,

agreed with—the thrust of Anglin's argument, and the judge later reiterated it in announcing and justifying the sentence.

As proof that the district court refused to consider his argument, Anglin points to the judge's explanation of *how* he would ensure that the sentence did not reflect a trial penalty: "I don't take into account any negotiations between the government and the defendant that do not result in a recommendation that is jointly urged upon the Court." Anglin would have preferred that the judge take a different tack, heeding his request that the court consider the inchoate plea agreement (which, as noted, would have recommended an overall sentence of seven to ten years) and discount the government's recommendation. But that goes to the *substantive* merit of the judge's response, not its *procedural* adequacy— which is all Anglin challenges here. The fact that Anglin did not get the answer he sought does not mean the judge refused to consider his argument. See *United States v. Lott*, 468 F. App'x 628, 632 (7th Cir. 2012) ("A review of the sentencing transcript shows that the judge did consider Lott's family circumstances argument, and his reason for rejecting it is clear."); *United States v. Jackson*, 547 F.3d 786, 794 (7th Cir. 2008) ("[T]he sentencing transcript reveals that the district court did consider this factor; unfortunately for Jackson, it happens to cut against him in this case.").

Next, Anglin contends that the district judge failed to consider his "diminishing returns" argument, which posited that additional years beyond Anglin's proposed twelve- or thirteen-year sentence would have limited marginal value, given that Anglin would be in his late thirties by the time he served them. The parties dispute whether Anglin preserved

this objection, a question we need not resolve because here, too, the judge adequately engaged with the argument.

Anglin's argument for leniency on the non-§ 924(c) counts boiled down to a generic point about the diminishing marginal returns of long prison sentences—a "stock" argument that virtually all defendants can make in some form or another. Sentencing courts "need not explicitly discuss" stock arguments. *United States v. Eberts*, 829 F.3d 882, 885 (7th Cir. 2016); see also *United States v. Garcia-Oliveros*, 639 F.3d 380, 382 (7th Cir. 2011) ("We have recognized that the need for explanation typically is diminished … when the arguments in mitigation are obviously without merit or so routine as to be 'stock.'"); *United States v. Pulley*, 601 F.3d 660, 667 (7th Cir. 2010) ("[A] district court may pass over, without discussion, arguments that are made as a matter of routine."); *United States v. Tahzib*, 513 F.3d 692, 695 (7th Cir. 2008) ("The other [arguments] are nothing more than stock arguments that sentencing courts see routinely: things like Tahzib's family ties, how his criminal history category over-represents the seriousness of his prior conviction, and the extent to which he accepted responsibility. They are the type of argument that a sentencing court is certainly free to reject without discussion.").

In any event, a fair reading of the transcript shows that the judge did address this argument, albeit somewhat obliquely. See *United States v. Cheek*, 740 F.3d 440, 456 (7th Cir. 2014) ("[W]e will not find a sentence to be procedurally unreasonable as long as the totality of the record establishes that the district judge considered the arguments in mitigation, even if implicitly and imprecisely.") (internal quotation marks omitted). Citing Professor Alexander's seminal work

on mass incarceration, the judge assured Anglin that he "does not approach sentencing blindly or without due regard for the consequences of substantial incarceration, particularly in a case like this with a young man age 25." In the next breath, the judge acknowledged his obligation under § 3553(a) to impose a sentence that is "no greater than necessary." That level of engagement with Anglin's generic argument was plenty, especially given that he received a guidelines sentence—indeed, at the bottom end of the range. See *United States v. Kappes*, 782 F.3d 828, 864 (7th Cir. 2015) ("[L]ess explanation is typically needed when a district court sentences within an advisory guidelines range.").

### 2. Supervised Release

Anglin also challenges the supervised release conditions, which he contends were substantively unreasonable and procedurally defective. Because Anglin did not raise his concerns before the district court, we must first determine whether he waived or merely forfeited his challenges.

"A waived claim … is one that a party has knowingly and intelligently relinquished; a forfeited plea is one that a party has merely failed to preserve." *Wood v. Milyard*, 132 S. Ct. 1826, 1832 n.4 (2012); see also *United States v. Wesley*, 422 F.3d 509, 520 (7th Cir. 2005) ("A forfeiture is basically an oversight; a waiver is a deliberate decision not to present a ground for relief that might be available in the law."). If Anglin merely forfeited his objections to the supervised release conditions, we review for plain error, but if he waived them, then the waiver "leaves no error for us to correct on appeal." *Wesley*, 422 F.3d at 520; see also *United States v. Burns*, 843 F.3d 679, 685 (7th Cir. 2016) ("Waiver … precludes judicial

review by extinguishing the error.") (internal quotation marks omitted).

Our decisions set forth the line between waiver and forfeiture in this context. In *United States v. Lewis*, 823 F.3d 1075 (7th Cir. 2016), we held that the defendant waived his objection to the supervised release conditions where the court asked, "Counsel, do you have any legal objection to the sentence I have proposed or request any further elaboration of my reasons under Section 3553(a) both as to the term of imprisonment or the conditions of supervised release?" and defense counsel responded, "no." *Id.* at 1083. Likewise, in *United States v. Donelli*, 747 F.3d 936 (7th Cir. 2014), the defendant argued that the judge failed to address a key argument in mitigation. *Id.* at 937. We disagreed, noting that the judge "closed the sentencing hearing by asking counsel whether they had any objection to the sentence or required 'any further elaboration' of the judge's reasons," and holding that defense counsel's failure to object to the sufficiency of the judge's explanation was a waiver. *Id.* at 939, 941.

*Lewis* and *Donelli* reflect the settled principle that, when the judge invites counsel to raise objections on a particular topic and counsel declines the invitation, appellate review is waived. See *United States v. Ortiz*, 843 F.3d 294, 297 (7th Cir. 2016) ("[T]hough Ortiz was told by the district judge at the hearing that this was Ortiz's chance to question the conditions of supervised release, Ortiz did not do so. So he waived objections to the conditions … ."); *United States v. Raney*, 842 F.3d 1041, 1044 (7th Cir. 2016) ("When the district court allows the defendant an opportunity to challenge conditions of supervised release, the defendant waives any objection to conditions to which he fails to object."); *United States v. Ga-*

*briel*, 831 F.3d 811, 814 (7th Cir. 2016) (finding waiver where the district judge "warn[ed] the parties in writing that failure to object to conditions recommended in the presentence report could be treated as waiver," and "later the lawyer said no when asked if she had 'any objections to those conditions'"); *United States v. Bloch*, 825 F.3d 862, 873–74 (7th Cir. 2016) (finding waiver as to all but one of the supervised release conditions where the defendant was given the opportunity to review the proposed conditions before the hearing, had a chance to object to them, and objected to only one); *Lewis*, 823 F.3d at 1079 ("Before sentence was actually imposed, the court expressly invited objections and requests for further findings or elaboration. The defense expressly declined the invitation. That was waiver."); *United States v. Maxfield*, 812 F.3d 1127, 1130 (7th Cir. 2016) ("[W]hen the court asked counsel if any argument in mitigation had been overlooked, counsel said no. Having passed up the chance for elaboration, Maxfield waived the argument, and cannot now argue that the court's explanation was inadequate."); *United States v. Rodgers*, 610 F.3d 975, 979 (7th Cir. 2010) ("Rodgers filed no objections to the factual findings in the [presentence report]. When asked on the record at sentencing if he had any such objections, his counsel stated, 'No, we do not.' This amounts to the intentional relinquishment of a known right which extinguishes any error and precludes appellate review."); cf. *United States v. O'Malley*, 739 F.3d 1001, 1005, 1007 (7th Cir. 2014) (finding waiver where the defendant "affirmatively stated that he had 'no objection' to" a proposed jury instruction).

By contrast, we have cautioned that giving the same response to a general question like "anything else?" effects no waiver, is merely a forfeiture, and thus allows for plain error

review. See *United States v. Schrode*, 839 F.3d 545, 555 (7th Cir. 2016) ("In the context of supervised release, a defendant's response to a general inquiry at the end of sentencing, unaccompanied by either (1) an explicit approval of the condition or (2) a strategic reason to forgo the argument at the hearing, does not constitute waiver."); *Lewis*, 823 F.3d at 1083 ("The judge's inquiry here was not a vague 'anything else?'"); *United States v. Speed*, 811 F.3d 854, 857–58 (7th Cir. 2016) (finding no waiver where the district court simply asked if there was "anything unclear or confusing").

In our case, the district judge stated that he was "imposing the mandatory terms of supervision as discussed in the presentence report for the reasons discussed in the presentence report" and "the additional conditions of supervision as discussed in the presentence report," but modified one of the conditions to read, "the defendant shall follow the instructions of his probation officer and answer truthfully all inquiries by the probation officer subject to his right under the Fifth Amendment against self-incrimination." The judge explained that he "believe[d] that supervision in this case is warranted particularly in light of the defendant's criminal history and failure to successfully complete state supervision prior to committing the crime in this case." The judge then asked, "Is there any reason to articulate these grounds for supervision any further?" to which defense counsel answered, "No, Your Honor."

Anglin complains that the judge did not orally pronounce each supervised release condition, and instead (with one exception) incorporated by reference the probation office's proposed conditions. Our decisions teach that the sentencing judge must "orally pronounce" each supervised re-

lease condition "from the bench." *Kappes*, 782 F.3d at 862; see also *United States v. Orozco-Sanchez*, 814 F.3d 844, 847–48 (7th Cir. 2016). There is an exception, however, where the defendant "had a chance [before sentencing] to review the [proposed] supervised release conditions as well as the reasons for imposing them," he "was given a meaningful opportunity to object," the judge "incorporated those proposed conditions by reference during its oral pronouncement," and "the oral pronouncement and written judgment do not conflict." *Bloch*, 825 F.3d at 872. In *Bloch*, the district court circulated its own proposed conditions before sentencing, but the exception also applies where the proposed conditions and grounds are circulated by the probation office. After all, if the probation office proposes supervised release conditions and the grounds therefor, the defendant is on ample notice that the judge will consider each of those conditions. See *United States v. Thomas*, 840 F.3d 920, 921 (7th Cir. 2016) (in applying *Bloch*, treating "written notice … prepared by the probation office" as the equivalent of the judge's own written notice); *United States v. Siegel*, 753 F.3d 705, 710 (7th Cir. 2014) (observing that "most judges, in deciding what conditions of supervised release to impose, rely heavily on the recommendations of the federal probation service").

The *Bloch* exception does not quite apply here. True, Anglin does not argue that the supervised release conditions proposed in writing by the probation office and then orally incorporated by reference by the judge conflict with the conditions set forth in the written judgment. But the judge did not give Anglin "a meaningful opportunity to object" to the conditions he imposed. *Bloch*, 825 F.3d at 872. Asking defense counsel whether there was "any reason to articulate these grounds for supervision any further" is best understood as

offering to elaborate on the *justifications* for the conditions, not as an invitation to substantively object to the conditions *themselves*. Given this, counsel's failure to ask the judge to orally pronounce each supervised release condition forfeits, not waives, the issue, and the judge's failure to make that oral pronouncement or to invite substantive objections to the conditions was plain error, warranting a remand. See *United States v. Sweeney*, 821 F.3d 893, 903–04 (7th Cir. 2016) ("The district court neither stated all the conditions orally nor obtained a waiver for doing so, and did not provide any explanation for many of the conditions. In addition, some of the specific conditions imposed here have been found too vague or otherwise improper … . Based on the logic of our recent cases, we must remand the case.").

That said, it is important not to make a fetish of orally pronouncing each supervised release condition, at least under the circumstances that prevailed in *Bloch*. A federal sentencing is the worst day of most defendants' lives, and the judge's announcement of the custodial sentence—particularly where the sentence is substantial—is the worst individual moment of the experience. The judge of course must turn to the supervised release conditions after announcing the custodial sentence. But if all the judge plans to do is to impose the supervised release conditions that have *already* been circulated (by the court or the probation office) and reviewed by the defendant, and if the judge gives the defendant a meaningful opportunity to make substantive objections, it can be gratuitously cruel to then make the defendant sit (or stand) through a five-, ten-, or at times fifteen-minute recitation of and justification for those conditions. If the defendant or his counsel wants that recitation, so be it, but otherwise, what possibly could be the point? After An-

glin had just heard and was in the initial stages of coming to terms with the stark and awful reality of his 230-month custodial sentence, we very much doubt that he cared to endure the judge's taking several minutes to tell him *what he already knew*, which is that that, upon his release in the early 2030s, he will have 72 hours to inform his probation officer of any change in his place of residence, or that he will have to submit to a drug test within fifteen days of his release and two tests within the following year, or that he will be unable to leave the judicial district without the court's or the probation officer's permission, or (unless he *really* loves irony) that he will need the court's permission before entering into any agreement to act as an informer or special agent of a law enforcement agency.

Having presented and prevailed on this issue at the appellate level, Anglin will have the opportunity to hear the judge orally recite the supervised release conditions, unless he chooses to waive it. And because we are vacating the supervised release conditions, there is no need to resolve Anglins' substantive challenges to them. See *United States v. Plada*, 628 F. App'x 443, 444 (7th Cir. 2016) (finding it unnecessary, when remanding because of procedural errors, to address substantive challenges to the supervised release conditions). To provide guidance on remand, however, we offer the following observations. See *United States v. Sainz*, 827 F.3d 602, 609 (7th Cir. 2016) (after remanding to fix two improper supervised release conditions, discussing problems with a third defective condition); *United States v. Ortiz*, 817 F.3d 553, 555 (7th Cir. 2016) ("[S]ince … the case has to be remanded because of errors in some of the conditions that were challenged, we'll address errors in [unchallenged con-

ditions] as well in order to prevent confusion in the district court on remand.").

One challenged condition required Anglin to "notify the probation officer at least 10 days prior to any change in his place of residence or in his place of employment." We have held that this condition "fails to indicate whether change in employment means changing employers or also includes changing from one position to another for the same employer." *Kappes*, 782 F.3d at 849 (internal quotation marks omitted). In its stead, the judge might consider a condition requiring Anglin to "notify Probation at least ten days prior to or as soon as you know about any changes in residence and any time you leave a job or accept a job." *United States v. Poulin*, 809 F.3d 924, 933 (7th Cir. 2016) (internal quotation marks omitted).

Another challenged condition required Anglin, at the probation officer's direction, to "notify third parties of risks that may be occasioned by [his] criminal record or personal history or characteristics." We have held that this condition impermissibly gives "no indication of what is meant by 'personal history' and 'characteristics' or what 'risks' must be disclosed to which 'third parties.'" *Id*. at 934 (internal quotation marks omitted); see also *United States v. Bickart*, 825 F.3d 832, 841–42 (7th Cir. 2016) (holding that this condition is "impermissibly vague"). In its stead, the district judge might consider imposing a condition that "specif[ies] limitations," such as the parties to be notified and the risks to be disclosed, "such that it is sufficiently clear to [Anglin] what conduct is allowed and disallowed." *Poulin*, 809 F.3d at 934. Or, the judge could craft a condition that simply requires Anglin to permit the probation officer to provide notification

to third parties. See *United States v. Miller*, 829 F.3d 519, 528 (7th Cir. 2016).

The other challenged conditions are satisfactory. The condition requiring Anglin to "report to the probation officer in a manner and frequency as directed by the court or probation officer" is acceptable. See *Ortiz*, 843 F.3d at 297 (holding that this condition was "vague, to be sure, but given that it will be years before Ortiz is released from prison, it is impossible to be more specific"); *Poulin*, 809 F.3d at 932 (approving that condition); *United States v. Armour*, 804 F.3d 859, 868 (7th Cir. 2015) (same). Although it is important that the manner and frequency of the required reporting be "reasonable," see *United States v. Hill*, 818 F.3d 342, 344 (7th Cir. 2016), routine administrative conditions like this one are "necessary incidents of supervision" that we may "fairly presume" the probation officer will implement "in a reasonable manner." *United States v. Warren*, 843 F.3d 275, 281 (7th Cir. 2016). The same is true of the condition that Anglin "shall follow the instructions of the probation officer." If during the supervised release term Anglin believes that the probation officer is issuing unreasonable instructions, he can bring the matter to the district court. See *Kappes*, 782 F.3d at 857–58 ("[I]f a particular probation officer exercises his or her discretion in an unreasonable manner, this exercise will be subject to review by the district court.").

The final challenged condition, that Anglin "use his best efforts to find and hold lawful employment, unless excused by the probation officer for schooling, training, or other acceptable reasons (e.g., childcare, eldercare, disability, age, or serious health condition)," also passes muster. The condition does not require Anglin to work despite an inability to do so,

see *Hill*, 818 F.3d at 345; it merely requires him to use his best efforts, unless excused for any number of reasons.

The question remains whether we should vacate the entire sentence and remand for a complete resentencing, or vacate only the supervised release conditions and limit the remand to modifying and orally pronouncing those conditions. We believe the better course is to vacate and remand only as to the supervised release conditions. See *United States v. Ray*, 831 F.3d 431, 439 (7th Cir. 2016) ("Sometimes it is sensible to fix problems in the supervised release portion of the sentence and let the rest stand. Whether to proceed that way is a decision committed to this court, applying the principles we have developed in our precedents.") (citations omitted); *Sainz*, 827 F.3d at 604 ("We affirm the restitution order, but we order a limited remand to correct some issues of vagueness and overbreadth in the conditions of supervised release."); *Poulin*, 809 F.3d at 936 (vacating the defendant's supervised release conditions in light of flaws with some of them, and remanding for resentencing as to supervised release conditions only); *Siegel*, 753 F.3d at 717 ("So the prison sentences in both our cases stand, but the cases must be remanded for reconsideration of the conditions of supervised release that we have determined to be inappropriate … .").

Anglin argues that vacatur of the supervised release conditions warrants a complete resentencing. We disagree. We do not think it plausible that orally pronouncing the conditions and slightly modifying some of them would induce the district judge to reconfigure other aspects of the sentence, particularly the imprisonment term. We remand for full resentencing only when such cross-cutting effects are within the realm of possibility. See *Kappes*, 782 F.3d at 867 (remand-

ing for a complete resentencing where "the balance struck by the sentencing judge might be disrupted [by the vacated supervised release conditions] to a degree where the judge would wish to alter the prison term and/or other conditions"); *United States v. Thompson*, 777 F.3d 368, 382 (7th Cir. 2015) (remanding four cases for complete resentencing where reconsideration of certain conditions "may conceivably induce one or more of the judges to alter the prison sentence that he imposed"). They are not here.

### III. Conclusion

The district court's judgment is affirmed, with the exception of the supervised release conditions, which are vacated. We remand for the limited purpose of amending and orally pronouncing the supervised release conditions.

AFFIRMED IN PART, VACATED AND REMANDED IN PART.